**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jerry WILLIAMS, Defendant–Appellant.**

**No. 90–6600.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 1, 1991.

Decided Dec. 17, 1991.

Joe B. Brown, U.S. Atty., Wendy Goggin, Melissa Harrison, Asst. U.S. Attys., William Cohen, Asst. U.S. Atty., (Argued and Briefed), Nashville, Tenn., for U.S.

Richard McGee (Argued and Briefed), Nashville, Tenn., James D. Causey, Memphis, Tenn., for Jerry Williams.

Before MARTIN and MILBURN, Circuit Judges, and JOINER, Senior District Judge.*

MILBURN, Circuit Judge.

Defendant Jerry Williams appeals his jury conviction and sentence for conspiracy to extort and extortion under the Hobbs Act, 18 U.S.C. §§ 371 and 1951. The issues raised in this appeal by the defendant are (1) whether the district court erred in denying defendant's special jury instruction request No. 1 and in giving its instruction regarding the definition of extortion under the Hobbs Act; (2) whether the district court erred in its application of the federal

* Honorable Charles W. Joiner, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

sentencing guidelines in this matter; and (3) whether defendant's right to a fair trial as secured by the Sixth Amendment was denied as a result of rulings by the district court to admit and exclude certain evidence. For the reasons that follow, we affirm the defendant's conviction but reverse and remand as to his sentence.

## I.

### A. *FACTS*

William Freeman and James Webb are the co-owners of Freeman–Webb Company Realtors ("Freeman–Webb"), a real estate company in the city of Nashville, Tennessee. In July of 1987, Freeman–Webb purchased a tract of land in the Bellevue section of Nashville, Tennessee, for approximately One Million Eight Hundred Sixty Thousand Dollars ($1,860,000). Although the property was zoned P.U.D. for apartment units, Freeman–Webb planned to develop the property for multi-use, specifically commercial. The real estate company obtained a line of credit of Three Million Dollars ($3,000,000) to purchase and develop the property. Shortly after the purchase, the company also entered into a contract to sell the front portion of the property to the Mitchell Company. However, the sale was contingent upon the zoning of the property being changed from apartments to a commercial development.

In Nashville, Davidson County, Tennessee, rezoning requires the approval of the Metropolitan Council, which must approve a bill changing zoning. If the Planning Commission approves the rezoning, a vote of 21 council members must approve the rezoning. If, however, the Planning Commission does not approve the rezoning, a vote of 27 Metropolitan Council members is required to approve the rezoning. Under an unwritten rule of courtesy, however, if the Metropolitan Councilman in whose district the property is located supports the rezoning, the other council members will also support the rezoning.

In an effort to have their property rezoned, Freeman and Webb met with a number of individuals, including Metropolitan Councilman Gary Odom in whose district the property was located. Mr. Odom told Freeman and Webb that he would not support the rezoning if Lafayette "Fate" Thomas, the Sheriff of Davidson County, was against it. Planning Commission member Jimmy Vance told them that he needed to know that Thomas did not have a problem with the project before he could support it. At that time, Sheriff Thomas was an extremely powerful politician who lived across the street from the property in the Coronado Condominiums.

Freeman and Webb met with Sheriff Thomas prior to the March 31, 1988, Planning Commission meeting when the proposed rezoning was to be first considered. During their meeting, Sheriff Thomas told them that he did not have any reason to be opposed to the project, and that they needed to work with the community. However, at the March 31, 1988, meeting of the Planning Commission, Freeman and Webb learned for the first time that Sheriff Thomas was opposed to the project and had even signed a petition against it. The rezoning was not approved by the Planning Commission at the March 1988 meeting.

Thereafter, Freeman–Webb made a number of changes to their proposed project, including a decision to build homes on the rear portion of the property rather than apartments. They spoke with a number of people about how they could change Sheriff Thomas' position on the project and enlisted the aid of others to assist them in that regard. One such person was Joseph Shrum, the real estate agent who had handled the contract between the Mitchell Company and Freeman–Webb. As Shrum knew that defendant Jerry Williams was a close associate of Sheriff Thomas, Shrum met with Williams and asked him if he could talk with Sheriff Thomas about the project. Williams told Shrum that he would be meeting with Thomas that day.

Shrum and Williams met again later that same day, and Williams told Shrum that he could be of some assistance, but that it would cost Five Hundred Thousand Dollars ($500,000). After being told that was too much money for such a small project, Williams replied that he would go talk to "his man" and get back with Shrum. A third meeting that same day was held be-

tween Shrum and Williams at which time Williams advised Shrum that "it could be done" for Two Hundred Fifty Thousand Dollars ($250,000). This information was then passed on by Shrum to Freeman and Webb.

At the first part of June 1988, Freeman, Shrum, and another individual traveled to Memphis, Tennessee. While in Memphis, defendant Williams took Freeman aside and asked him if he had talked with Mr. Shrum and understood the "deal." Freeman told Williams that he would get back with him at a later date.

Thereafter, a series of telephone conversations took place between Freeman and defendant Williams up to June 23, 1988. Williams told Freeman that he could help him with Sheriff Thomas and also told Freeman that he could show him in a test that he could deliver the sheriff. Thereafter, at a meeting of the Metropolitan Council, Freeman observed a deputy sheriff telling Councilman Odom that Fate Thomas was "okay on this if you are, and you would know what he meant." This event was referred to by Freeman and Williams in a later conversation that was recorded. Freeman–Webb's rezoning proposal was presented to the Planning Commission a second time on June 23, 1988. At that meeting, Sheriff Thomas was sitting on the front row immediately adjacent to the table where the commissioners were sitting. When the commission asked individuals opposed to the Freeman–Webb project to stand, Sheriff Thomas stood. After the rezoning proposal failed again, Freeman and Webb became convinced that they could not be successful in having their property rezoned unless Sheriff Thomas supported them.

Thereafter, Freeman–Webb again made a number of additional changes to their project. They also decided to seek the direct approval of the Metropolitan Council rather than first obtaining the approval of the Planning Commission. George Armistead, a Councilman at Large, agreed to introduce a rezoning bill for them.

On August 8, 1988, Councilman Armistead went to see Sheriff Thomas because Thomas lived across the street from the proposed project and because Thomas had a great deal of political influence. After Armistead told Sheriff Thomas that he was introducing the rezoning bill for Freeman–Webb, Thomas replied, "What's in it for Thomas?" Architect Kevin Tucker, whose firm had been hired by Freeman–Webb to assist them, was present for a portion of the meeting between the councilman and the sheriff and left some architectural drawings of the proposed development with Thomas.

Architect Tucker met with defendant Williams later that same day. Williams had with him the plans Tucker had left earlier with Thomas. Williams advised Tucker that Freeman–Webb had to have Thomas on their side, and that they were "dead" if they did not have Thomas' support. Williams then spoke of a "consulting fee" which would "flow" to make the right things happen and also told Tucker that he, Williams, had the right access to Sheriff Thomas which was needed to get the rezoning approved. Immediately following this meeting, Architect Tucker told Freeman what had occurred.

Around the time the rezoning bill was introduced by Councilman Armistead, Freeman had a further conversation with real estate agent Shrum, who told Freeman that he had received a telephone call from defendant Williams. Williams had asked Shrum if the developers and Shrum were trying to go around him. Williams had further stated that the project was not going to get approved without Sheriff Thomas and him, that they had stopped the project once, and could stop it again. Freeman was convinced that defendant Williams and Sheriff Thomas were capable of stopping the project, and that if they were not paid the money demanded, the rezoning bill would never be passed.

During this same period of time, architect Tucker had a series of conversations with Milton "Rip" Hornbuckle, a good friend of Sheriff Thomas. After explaining to Mr. Hornbuckle what the project was about, he asked Hornbuckle to speak with Sheriff Thomas. After contacting Sheriff Thomas, Hornbuckle informed Tucker that Thomas wanted something for his support,

and in a later conversation, advised Tucker that Thomas wanted One Hundred Thousand Dollars ($100,000). It was Tucker's understanding that the entire amount stated by Hornbuckle was to go to Sheriff Thomas. The content of these conversations was reported by Tucker to Freeman and Webb.

Being convinced that they could not obtain the rezoning if they did not pay money and that they would go to jail if they did, Freeman, Webb, and Tucker decided to report what had transpired to the law enforcement authorities. On August 15, 1988, they spoke with Freeman's friend, Harold "Ed" Creamer, a United States Secret Service agent. Mr. Creamer passed the information on to agents of the Federal Bureau of Investigation, and the following day, Freeman met with FBI agents and informed them of what had occurred. Freeman, Webb, and Tucker agreed to allow their conversations with defendant Williams and Hornbuckle to be recorded, and thereafter had a series of recorded conversations with Williams and Hornbuckle.

On August 22, 1988, Tucker and Freeman had two meetings with defendant Williams, both of which were videotaped. Freeman explained to Williams that they needed the support of Councilman Gary Odom, and that they needed Sheriff Thomas to tell Odom that he supported the project. Williams advised them that Sheriff Thomas would try to speak with Odom at a meeting of the Bellevue Exchange Club the following morning. Williams also discussed the payment of Two Hundred Fifty Thousand Dollars ($250,000) and said that Sheriff Thomas did not want to leave any "fingerprints" or evidence that he had been involved in the rezoning effort.

On August 24, 1988, Freeman and Williams had two recorded telephone conversations although Williams expressed reluctance to talk on a "funny phone," *i.e.*, a mobile telephone. Williams advised that Odom was not present at the Exchange Club meeting the day before, but that attempts would be made to talk to Odom. Payment of the money was also discussed.

During the next few days, defendant Williams and Freeman continued to talk about the payment of money and the need for Sheriff Thomas to talk to Councilman Odom. On August 29, 1988, defendant Williams and Freeman met at Freeman's office, and this meeting was videotaped. Williams placed a call to Sheriff Thomas, and Williams' part of the conversation can be heard on the videotape. As Williams held the telephone so as to enable Freeman to hear the conversation, Freeman was able to recognize the sheriff's voice. Sheriff Thomas told Williams that he had been having trouble getting in contact with Councilman Odom, and that he would go to his home and get him out of bed to talk with him if necessary. As earlier indicated, if Odom, being a resident of the district where the property was situated, supported the rezoning, the other council members would also support the rezoning bill under an unwritten rule of courtesy.

Later that same day, Freeman and defendant Williams spoke on the telephone, and their conversation was recorded. This conversation likewise had to do with Sheriff Thomas' efforts to speak with Councilman Odom. On August 30, 1988, Councilman Odom was again not present at the Bellevue Exchange Club meeting, and his absence was later confirmed by defendant Williams in another recorded telephone conversation with Freeman.

On August 31, 1988, defendant Williams met again with Freeman at Freeman's office. This meeting was also videotaped. Williams explained that Sheriff Thomas had not been able to contact Councilman Odom, and that if he could not get in contact with Odom, they would get enough council votes to pass the rezoning bill without Odom's support. Williams placed another telephone call to Sheriff Thomas from Freeman's office and discussed the matter with Thomas. Again, Freeman heard Thomas' voice on the telephone. Payment of a portion of the Two Hundred Fifty Thousand Dollars ($250,000) as a down payment was also discussed. Williams again said that Thomas could not leave any "fingerprints" in connection with the rezoning.

Following the August 31 meeting, defendant Williams was observed entering the sheriff's office at the Metropolitan Courthouse in Nashville. The sheriff was present at that time. From the sheriff's office, Williams called Freeman while Freeman was in his automobile. Williams and Freeman talked for a few minutes, and then Freeman called Williams back from his office. The latter conversation was recorded. In a later telephone conversation that same day, payment of the Twenty-five Thousand Dollars ($25,000) down payment was also discussed.

On September 2, 1988, defendant Williams and Freeman met again in Freeman's office. During this meeting, the two men again discussed the votes of council members and Sheriff Thomas' meeting with Odom. Although Freeman had the Twenty-five Thousand Dollars ($25,000) in cash for the down payment, Williams did not ask for the money, because there was someone outside Freeman's office, and Williams was apparently suspicious about that individual.

On September 3, 1988, defendant Williams placed a telephone call from Memphis to Freeman at his residence. Williams told Freeman that Thomas and Councilman Odom had met and that the meeting had gone "okay." Williams also advised that Odom had requested that Freeman defer action on the rezoning bill on September 6, 1988, when the bill was to be considered by the Metropolitan Council. Thereafter, Freeman asked Councilman Armistead to defer action on the bill on September 6, and Armistead complied.

On September 8, 1988, defendant Jerry Williams traveled to Nashville, Tennessee. Upon arrival in Nashville, he went directly to the sheriff's office, and then took an automobile ride with Sheriff Thomas and Raymond Gilley, an employee of the sheriff's department. Approximately one hour later, the three men returned to the sheriff's office, and then Williams went to Freeman's office. During a videotaped meeting at Freeman's office, Freeman paid Williams Twenty-five Thousand Dollars ($25,000) in cash. The money was given to Williams in

a brown envelope, all of which can be seen on the videotape. Williams looked in the envelope and can be heard on the videotape saying, "That will work." Williams confirmed that the total amount of money to be paid was Two Hundred Fifty Thousand Dollars ($250,000), and also discussed his need for a letter from Freeman to "legitimatize" their relationship. Williams also suggested what should be included in the letter.

Upon leaving Freeman's office, defendant Williams went to a restaurant where he was observed with the envelope the entire time he was in the restaurant. Williams then went back to Freeman's office where he was videotaped being given the letter he had requested from Freeman. The letter purported to be an agreement between Freeman–Webb and Jerry Williams to pay Williams Two Hundred Twenty-five Thousand Dollars ($225,000) to complete a marketing and research project. Williams can be seen on the videotape reading the letter in Freeman's office and heard saying, "That will work."

After leaving Freeman's office, Williams was observed by TBI agents being driven to the offices of the Tennessee Racing Commission. However, when he went into the Racing Commission offices, Williams did not take the brown envelope containing the money with him. Upon leaving the Racing Commission, Williams was observed being driven to Sheriff Thomas' office. Sheriff Thomas was present when Williams arrived, and Williams and Thomas were observed talking briefly outside Thomas' office. Williams had the envelope in his hands when they went inside the sheriff's office. Williams later left by himself, still carrying the brown envelope. However, the envelope appeared to be thinner when he left the sheriff's office than it was before he went in.

On September 14, 1988, the day before the Planning Commission was to meet, Freeman met at his office with Dudley Phillips, a member of the Planning Commission. Phillips told Freeman that Fate Thomas had not spoken with him, and that he would not vote in favor of the rezoning

unless Fate Thomas told him that he could. While Phillips was in Freeman's office, defendant Williams called Freeman, and this call was recorded. Freeman tried to get Williams to talk directly to Phillips, but Williams would not because he did not want to leave any "fingerprints."

The following day, or on September 15, 1988, Freeman received a telephone call from defendant Williams. In this recorded telephone conversation, Williams told Freeman that there was to be a meeting between Dudley Phillips and "some of our people" at 12:15 p.m. He also stated that the meeting had been set up by the principals, Dudley Phillips and Fate Thomas. Upon concluding the conversation with Williams, Freeman called TBI agent Jeffrey Long and advised him of the scheduled meeting. TBI agents observed Fate Thomas and Dudley Phillips together at 12:15 p.m. outside the sheriff's office. At the Planning Commission meeting held that same day, Phillips voted in favor of the Freeman–Webb project.

Prior to September 16, 1988, only architect Tucker and Webb were aware that Freeman was cooperating with law enforcement officials. However, on September 16 and 17, 1988, Freeman had conversations with their personal attorney who had been assisting Freeman–Webb in the rezoning effort. Freeman told his personal attorney that he had been cooperating with law enforcement officials in connection with the rezoning project, that he had recorded certain conversations, that he had paid Twenty-five Thousand Dollars ($25,000) to defendant Jerry Williams, that the money was linked to Fate Thomas, and that an additional payment of Two Hundred Twenty-five Thousand Dollars ($225,000) was to be made in the future. Freeman's personal attorney leaked this information to others, and as a consequence, Fate Thomas' attorney heard about what Freeman had said about cooperating with law enforcement officials.

On September 20, 1988, the rezoning bill was again deferred at the Metropolitan Council meeting because Freeman and Webb did not want a vote on a bill that had been tainted by the payment of money. Thereafter, on September 22, Freeman received a letter from defendant Jerry Williams severing their relationship. On September 27, 1988, Sheriff Thomas wrote a letter to the members of the Planning Commission urging them to vote against the Freeman–Webb project. On October 3, 1988, Sheriff Thomas wrote letters to Gary Odom, Joanne North, and George Armistead, urging them as members of the Metropolitan Council to vote against the Freeman–Webb project.

On October 5, 1988, defendant Jerry Williams was interviewed by FBI and TBI agents at his parents' home in Memphis, Tennessee. Williams told the agents that he knew Freeman, and that Freeman had tried to hire him in connection with Freeman–Webb projects in Memphis and Chicago, Illinois. Williams stated that he did not go to work for Freeman because Mr. Freeman wanted him to move to Nashville, Tennessee, because he had the potential of making more money with his present employer, and because Freeman's offer of employment came in a short letter which Williams thought was strange. Although Williams said he received the letter from Freeman in Nashville, he stated that he did not open and read the letter until he was on the airplane riding back from Nashville to Memphis. He stated that he had been paid Twenty-five Thousand Dollars ($25,000) in cash by Freeman to hire some lobbyists, and also said that he had turned the money over to his attorney because he was surprised to get cash.

Williams also stated that he had brief conversations with Sheriff Fate Thomas about the Freeman–Webb project, but that the project was never the primary reason he went to see Thomas. Despite what the agents had observed, Williams stated that on the day he received the money from Freeman, he went to see Sheriff Thomas before seeing Freeman, but that Thomas was not in his office. He never mentioned seeing Sheriff Thomas after he received the money. After being told by Special Agent Donald Mason that he was lying, the interview ended.

Later that day, Mr. Mason spoke with defendant Williams' attorney, Mr. Causey, who advised him that Williams wanted to make a brief statement. Williams then admitted that he had been untruthful about the Twenty-five Thousand Dollars ($25,000) when he had spoken with Mr. Mason earlier that day. He said that he had not taken the money to Memphis and given it to Mr. Causey. He did not, however, say what he had done with the money.

Freeman–Webb was never successful in having the property rezoned, and they were unable to sell the property to the Mitchell Company. However, they were ultimately able to sell the property to another purchaser for a profit, but for less than they would have made had the property been rezoned.

### B. PROCEDURAL HISTORY

On February 1, 1990, an indictment was returned by a federal grand jury for the Middle District of Tennessee in which defendant Jerry Williams was charged with violating the Hobbs Act, 18 U.S.C. § 1951, by extorting money from William Freeman through the use of fear of economic loss. Williams was one of seven defendants who were charged in a multi-count RICO indictment. On May 2, 1990, Williams' trial was severed from that of his co-defendants. A superseding indictment was returned on August 30, 1990, in which defendant Williams was again charged with violating the Hobbs Act and also charged with conspiracy to violate the Hobbs Act, in violation of 18 U.S.C. § 371.

On September 10, 1990, defendant Williams went to trial by a jury, and on September 18, 1990, Williams was found guilty on both counts of the superseding indictment. On December 6, 1990, he was sentenced to a term of forty-one (41) months as to each count, with the terms of imprisonment to run concurrently. A special assessment of One Hundred Dollars ($100.00) was imposed for both counts, and after service of his forty-one (41) months, Williams will be placed on supervised release for a period of three years concurrently on each count with the requirement

that he pay the monthly cost of such release or $96.66 per month. This timely appeal followed.

### II.

### A.

 The defendant first argues that the district court's instructions to the jury as to what constitutes extortion under the Hobbs Act were incorrect and that the district court erred in denying the defendant's special jury instruction request No. 1. We review jury instructions as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury. *United States v. Horton*, 847 F.2d 313, 322 (6th Cir.1988) (quoting *United States v. Martin*, 740 F.2d 1352, 1361 (6th Cir.1984), *aff'd after remand*, 757 F.2d 770 (6th Cir.), *cert. denied*, 472 U.S. 1029, 105 S.Ct. 3506, 87 L.Ed.2d 636 (1985)). "It is not error to fail to use the language requested by the parties if the instruction as given is accurate and sufficient." *Horton*, 847 F.2d at 322. A district court's refusal to deliver a requested instruction is reversible only if that instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense. *United States v. Parrish*, 736 F.2d 152, 156 (5th Cir.1984).

Defendant Williams insists that the district court's jury instructions concerning the Hobbs Act were inadequate in that they did not tell the jury that they were required to find that the defendant made an actual, expressed, or implied threat, and because they did not instruct the jury that the payment made by William Freeman to the defendant must have been made under duress or coercion. Defendant further insists that such inadequacies would have been cured if the district court had given defendant's requested jury instruction concerning the use of actual or threatened force. The defendant's jury request No. 1 was as follows:

The terms actual or threatened force, violence or fear as used in these instructions are to be understood in their commonly accepted meaning.

Fear is a state of anxious concern, alarm or apprehension of anticipated harm. It does not necessarily refer to physical fear or fear of violence. It includes fear of economic law [sic]. It is necessary that the jury find that by threats of force or violence fear was created in the victim's mind; that in the circumstances it was reasonable for the victim to have such fear and that the defendant made use of such fear to extort or attempt to extort money.

The instructions given by the district court on this issue were:

The term "fear" means a state of anxious concern, alarm or apprehension of harm, and it includes fear of economic loss or damage. It is not necessary that the government prove that the fear of economic loss was the consequence of a direct threat made by the defendant. Nor is it necessary for the government to prove that the defendant actually crated [sic] the fear in the mind of his victim, or was responsible for creating that fear. However, it must be proved that the defendant intended to exploit the fear of the alleged victim. The fear of economic loss must be a reasonable one. The mere voluntary payment of money or delivery of property, unaccompanied by any fear of economic loss, would not constitute extortion.

. . . .

To find the defendant guilty of extortion, you must find that the victim reasonably believed that Lafayette "Fate" Thomas had the power and influence to hurt the victim's prospects of obtaining the zoning change, even if that fear was not caused by a direct threat by the defendant, and that the victim was in fear of not obtaining the zoning change, unless he gave money to the defendant.

■ The cases that have considered similar challenges to instructions have uniformly rejected them. In *United States v. Lisinski*, 728 F.2d 887 (7th Cir.), *cert. de-*

*nied*, 469 U.S. 832, 105 S.Ct. 122, 83 L.Ed.2d 64 (1984), the Seventh Circuit decided that no threat, either direct or indirect, need be proven to establish a violation of the Hobbs Act based on the theory of wrongful use of fear of economic harm. In *Lisinski*, the defendant exploited a restaurant owner's fear of losing his liquor license to extort cash payments. On appeal, he argued that the government's proof at trial showed no threat had been made and that the victim's fears of economic harm were self-generated. After surveying a number of cases in this area, the court directly held that

the wrongful use of fear does not require a threat—although, in the victim's mind, the threat—usually implied—will be present. The wrongful use of fear is satisfied if the extortioner exploits the victim's fear of economic loss. . . .

*Id.* at 892. Thus, the extortionist need not be responsible for the state of fear in which the victim finds himself. It is enough if the extortionist exploits that fear and thereby wrongfully obtains money or property. *United States v. Capo*, 791 F.2d 1054, 1062 (2d Cir.1986) (fear of loss need not be created by defendant), *vacated on other grounds*, 817 F.2d 947 (2d Cir.1987) (en banc) (evidence insufficient to sustain conviction); *United States v. Billups*, 692 F.2d 320, 330 (4th Cir.1982), *cert. denied*, 464 U.S. 820, 104 S.Ct. 84, 78 L.Ed.2d 93 (1983) ("[F]ear need not be the consequence of a direct or implicit threat by the defendant. . . ."); *United States v. Crowley*, 504 F.2d 992, 996 (7th Cir.1974) ("[I]t is unnecessary for the government to prove that defendant actually created the fear in the minds of his victims."). We adopt the rationale of these cases decided by the Second, Fourth and Seventh Circuits.

■ Defendant's proffered instruction is incorrect insofar as it states that "[i]t is necessary that the jury find that by threats of force or violence fear was created in the victim's mind. . . ." As has been pointed out, the fear of economic harm may arise independently of any action by the defendant, and it need not be caused by "threats of force or violence." It is enough if the

fear exists and the defendant intentionally exploits it. Therefore, as defendant's proffered instruction was inaccurate, the district court was correct in refusing to give it.

**B.**

 The district court applied United States Sentencing Guideline ("U.S.S.G.") section 2B3.2 to calculate defendant's offense level. Section 2B3.2 prescribes a base offense level of eighteen, which the district court increased to twenty, pursuant to section 2B2.1(b)(2) because of the amount of money involved in the extortion. Defendant argues that the court should not have applied section 2B3.2 and should have applied section 2C1.1 in its place, an action that would have resulted in a significantly lower base offense level. This court will accept the factual findings of a district court in respect of the sentencing guidelines unless they are clearly erroneous, *United States v. Tucker*, 925 F.2d 990, 991 (6th Cir.1991), and will "give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e).

Application Note 2 to section 2B3.2 provides:

> This guideline applies if there was any threat, express or implied, that reasonably could be interpreted as one to injure a person or physically damage property, or any comparably serious threat, such as to drive an enterprise out of business. Even if the threat does not in itself imply violence, the possibility of violence or serious adverse consequences may be inferred from the circumstances of the threat or the reputation of the person making it. An ambiguous threat, such as "pay up or else," or a threat to cause labor problems, ordinarily should be treated under this section.

This Application Note makes it clear that section 2B3.2 is to be applied in case of express or ambiguous threat. As defendant points out in his brief, it is true that the district court instructed the jury that no *direct* threat need be proven by the government in order to secure a conviction.

The Application Note, however, also speaks in terms of implied and ambiguous threats, such as "pay up or else." In this case, defendant's exploitation of the victims' fears was based on the implied threat that, unless payments were forthcoming, rezoning would never take place, and the victims would suffer a devastating economic loss. When defendant Williams told architect Kevin Tucker that the developers were "dead" if they did not have Sheriff Fate Thomas' support, and then implied that a "consulting fee" would get the necessary rezoning approved, he made an implied threat that brought him within the terms of section 2B3.2.

██ Defendant urges the application of section 2C1.1 as an alternative. Section 2C1.1 is designed for the punishment of a person who bribes a public official or "a public official who solicits or accepts such a bribe." U.S.S.G. § 2C1.1, comment. (backg'd.). Defendant, however, was not a public official, and Sheriff Thomas, whose political force was the weapon employed by defendant, was to be bribed in a matter not involving his official actions, for he was not a member of the Planning Commission or the Metropolitan Council.

It appears that the implicit threats employed by the defendant bring his case within the ambit of section 2B3.2, and the fact that neither defendant nor his shadowy counterpart, Sheriff Thomas, were to take any official action in exchange for a bribe tends to take this case out of the operation of section 2C1.1. When due deference is given to the district court's application of the guidelines to the facts as required by 18 U.S.C. § 3742(e), there is no error in its decision.

**C.**

██ Defendant next contends that the district court erred in increasing his offense level by two points under U.S.S.G. section 3C1.1. The district court found that defendant had obstructed the administration of justice by telling material falsehoods to government agents during the official investigation of the case.

United States Sentencing Guidelines section 3C1.1 provides:

> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

Application Note 4(b) states that "making false statements, not under oath, to law enforcement officers ..." does not warrant application of section 3C1.1 "unless Application Note 3(g) above applies...." Application Note 3(g) states that the two-level enhancement of section 3C1.1 should apply to situations in which a defendant has provided "a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense...."

As earlier stated, review of a district court's sentencing guidelines decision is conducted under the clearly erroneous standard as to fact-finding. Deference is given to a district court's application of the guidelines to the facts.

The district court found, and defendant concedes, that defendant misled agents of the Federal Bureau of Investigation and the Tennessee Bureau of Investigation when they interviewed him on October 5, 1988. The list of defendant's major lies includes the assertions (a) that Freeman had tried to hire him in connection with certain projects but that he had declined employment, (b) that Freeman paid him $25,000 in cash to hire lobbyists, and (c) that he did not meet with Sheriff Thomas on September 8, 1988, after going to Freeman's office to receive the $25,000 cash down payment. The crucial question is whether these false statements, not made under oath, "significantly obstructed or impeded the official investigation" of this case.

Defendant argues that his false statements could not have *significantly* impeded the government's investigation of this case because the investigation was nearly complete when the agents decided to interview him. At that time they already knew the true facts of the case from their surveillance, their audio and video tape recordings, and their cooperating witnesses such as Freeman, Webb, and Tucker.

The government argues that defendant's falsehoods significantly impeded the investigation in that the government was required to obtain telephone records and conduct a number of interviews as well as transcribe the numerous tape recorded conversations, which conversations needed to be corroborated by other evidence. The government also argues that, if defendant had "spoken truthfully during his interview with the agents, the investigation, which was still in its beginning stages, would have proceeded much more quickly, and certain investigation need never have been done."

It is unlikely that defendant's lies impeded the investigation of this case because the FBI & TBI agents already knew the true nature of the relationship between Freeman and defendant from Freeman's full cooperation as corroborated by the agents' surveillances and tape recordings. They also knew by the same means that defendant's statement about having been paid $25,000 to hire a lobbyist was a lie, and they knew from surveillance that defendant had met with Sheriff Thomas after relieving Freeman of $25,000 on September 8, 1988. Since they already had the facts, they were not misled. Moreover, with regard to the government's contention that defendant's failure to be truthful required it to go to additional lengths such as obtaining telephone records, transcribing taped conversations, and conducting some additional interviews, it appears that those interviews were aimed at finding out how the fact of Freeman's cooperation with the government leaked to Sheriff Thomas' attorney, which is immaterial to the case against defendant.

▇ Indeed, it seems that the government's real argument is not that defendant succeeded in misleading anyone, but that his failure to confess and cooperate with the government when first approached required the government to continue an investigation that might otherwise have been

shortened. This argument is not supported by any provision in section 3C1.1, and the government cites no authority for it. The focus of the guideline is on whether defendant, by actively making material false statements (and not by a passive refusal to cooperate), *succeeded* in significantly impeding the investigation. Failed attempts to shift the investigative searchlight elsewhere are not covered by the guidelines.

In *United States v. Rodriguez*, 942 F.2d 899, 902 (5th Cir. Sept. 11, 1991), the Fifth Circuit held that a defendant's use of an alias after his arrest and during a continuing investigation did "not support the [3C1.1] adjustment because the alias did not significantly hinder the investigation." In *United States v. Fiala*, 929 F.2d 285 (7th Cir.1991), the Seventh Circuit reversed an adjustment under section 3C1.1 where the defendant, having been stopped on the highway, was asked if he had anything illegal in his car. His negative answer put police to the trouble of detaining him for one and one-half hours until a drug-sniffing dog could be procured to locate the marijuana hidden in the car. The court found that

> Fiala's statement clearly does not meet the standards of Note 3(g): his denial of guilt was neither material nor could it possibly be said to have significantly obstructed the troopers investigation.

*Id.* at 290.

These cases both involve situations in which defendant's truthful cooperation would have saved investigating authorities some time and effort, yet the reviewing courts ignored those obvious facts. Both cases lead to the conclusion that a defendant's false statements must in some active way hurt or retard an investigation. *Cf. United States v. Barnett*, 939 F.2d 405, 407 (7th Cir.1991) (false statements caused no additional expenditure of investigative resources); *United States v. Urbanek*, 930 F.2d 1512, 1515 (10th Cir.1991) ("[I]nvestigators already had the correct information in their possession when they asked the questions.").

It is true that defendant Williams lied to investigating agents on October 5, 1988, but Application Note 4(b) specifically permits lies to investigating agents provided they do not significantly obstruct or impede the investigation. Even if it could be accepted that defendant's false statements obstructed or impeded the investigation, something by no means obvious, we do not believe that defendant's statements *significantly* obstructed or impeded the investigation. The facts are that the investigation of defendant was reaching its conclusion, the tapes were practically conclusive corroboration of Freeman's expected testimony, and defendant's false statements fooled no one.

"Findings of fact important to calculating a defendant's offense level or criminal history category must generally be made by a preponderance of the evidence." *United States v. Walton*, 908 F.2d 1289, 1301 (6th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 532, 112 L.Ed.2d 542 (1990). Here there is little evidence of an obstruction or impeding of the investigation, and no evidence of a significant obstruction or impediment. Therefore, the district court clearly erred in applying section 3C1.1 to increase defendant's offense level in this case.

### D.

Defendant argues that the district court erred in refusing to reduce defendant's offense level by two levels under U.S.S.G. § 3E1.1, which provides for a reduction where "the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct . . . ." Our cases hold that "the defendant bears the burden of showing by a preponderance of the evidence that he or she has accepted responsibility for the crime committed." *United States v. Williams*, 940 F.2d 176, 181 (6th Cir.1991).

The district court denied defendant's request for a two-level reduction under this section, finding that defendant had never made a voluntary and truthful admission of his involvement in the offenses charged. The presentence report discussed a written

statement furnished by defendant to his probation officer in which (a) defendant tried to portray his contact with Freeman as a legitimate business relationship in which he was to be a lobbyist, (b) he denied offering Sheriff Thomas any of the money he received from Freeman, and (c) he stated that he had not brought up the subject of money, but that Freeman and Joe Shrum had done so.

The determination of defendant's acceptance of personal responsibility is a question of fact, and the district court's findings are to be accepted by reviewing courts unless clearly erroneous. *United States v. Snyder*, 913 F.2d 300, 305 (6th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991); *United States v. Christoph*, 904 F.2d 1036, 1041 (6th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991); *United States v. Luster*, 889 F.2d 1523, 1525 (6th Cir.1989). Reviewing courts also bear in mind that, where credibility determinations must be made, the district court is always in the best position to draw the fine distinctions sometimes necessary to the resolution of such issues. Therefore,

> [b]ecause the trial court's assessment of a defendant's contrition will depend heavily on credibility assessments, the "clearly erroneous" standard will nearly always sustain the judgment of the district court in this area.

*United States v. Thomas*, 870 F.2d 174, 176 (5th Cir.1989).

In this case, the district court rejected the defendant's characterization that this was a case of "one con man attempting to out con another con man," and found that defendant had not accepted responsibility. Application Note 2 to section 3E1.1 provides:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse.

Defendant put the government to its burden of proof at trial and denied the essential facts of his guilt. The district court's findings that defendant has not yet fully admitted guilt or expressed remorse are supported by the record in this case, and accordingly there is no error in the court's refusal to award defendant a two-level reduction pursuant to section 3E1.1.

### E.

Defendant argues that the district court erred when it admitted the seven items of evidence listed below:

1. Webb testified that Thomas told Freeman and him he was not opposed to zoning.

2. Shrum testified that Thomas had the power to stop zoning project.

3. Freeman testified that Odom said that unless Thomas supported the project, Odom would not support it.

4. Freeman testified that Corbin and Hooker said they did not think Thomas was against the zoning.

5. Freeman testified that a sheriff's deputy told Odom at a planning commission meeting that Thomas was "okay" on zoning.

6. Creamer testified that Freeman told him Thomas wanted money to get his property zoned.

7. North testified that Thomas, Lineweaver and Odom could influence the public to respond for or against the zoning.

Brief of Appellant at 43. Defendant contends that the testimony violates the hearsay rule, Fed.R.Evid. 802, and the lay opinion rule, Fed.R.Evid. 701. These violations, he alleges, deprived him of his right to confront the witness against him in further violation of his Sixth Amendment rights.

The district court admitted the evidence mentioned in items 1, 3, 4, 5, and 6 for the purpose of allowing the government to show Freeman's fearful state of mind and its reasonableness. The testimony summarized in item 2 was admitted as relevant to the reasonableness of Freeman's belief that Sheriff Thomas could prevent the rezoning Freeman desired. Ms. North's testimony, mentioned in item 7, was also admitted on this ground.

A trial court's evidentiary rulings will not be reversed absent a clear showing of abuse of discretion. *United States v. Rios,* 842 F.2d 868, 872 (6th Cir.1988) (per curiam), *cert. denied,* 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989); *United States v. Mahar,* 801 F.2d 1477, 1495 (6th Cir.1986). A finding of abuse of discretion will be made only where the reviewing court is firmly convinced that a mistake has been made. *Schrand v. Federal Pac. Elec. Co.,* 851 F.2d 152, 157 (6th Cir.1988).

It is clear from the record that the testimony summarized in items 1, 3, 4, 5, and 6 was admitted to establish the victims' state of mind and was not hearsay as defined by Fed.R.Evid. 801(c) because it was not offered to prove the truth of the matter asserted. Where the extortionate scheme alleged exploits a victim's fear of economic harm, the prosecution must establish the victim's state of mind as "an essential element of the crime charged." *United States v. Biondo,* 483 F.2d 635, 643 (8th Cir.1973), *cert. denied,* 415 U.S. 947, 94 S.Ct. 1468, 39 L.Ed.2d 563 (1974); *United States v. Lynn,* 608 F.2d 132, 135 (5th Cir.1979). It was therefore proper for the court to admit this testimony because the

> testimony of victims as to what others said to them, and the testimony of others as to what they said to victims is admitted not for the truth of the information in the statements but for the fact that the victim heard them and that they would have tended to produce fear in his mind.

*United States v. Hyde,* 448 F.2d 815, 845 (5th Cir.1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 737, 30 L.Ed.2d 745 (1972). Defendant is simply mistaken when he characterizes this testimony as hearsay. Because it does not meet the definition of hearsay, defendant's Sixth Amendment rights to confront the witness against him have not been infringed.

> In the absence of some special unfairness or unreliability, compliance with Article VIII of the Federal Rules of Evidence should constitute compliance with Constitutional confrontation requirements.

4 Jack B. Weinstein and Margaret A. Berger, *Weinstein's Evidence* § 800[04] (1988). *See Bourjaily v. United States,* 483 U.S. 171, 182–83, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987).

As for the evidence given by Ms. North and Mr. Shrum concerning their opinions of Sheriff Thomas' political power, it is admissible because their lay opinions were rationally based on their perceptions, and thus their opinions were within the requirements of Fed.R.Evid. 701. Defendant cites no authority that casts doubt on the action of the district court in this matter, and any error committed in the admission of this testimony is harmless. It is harmless because the question of whether Sheriff Thomas actually had influence in zoning matters was irrelevant: what mattered was whether the victims thought he did.

In *United States v. Neuroth,* 809 F.2d 339, 342 (6th Cir.) (en banc), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3190, 96 L.Ed.2d 678 (1987), this court stated that "[a]n error, not of constitutional dimension, is harmless unless it is more probable than not that the error materially affected the verdict." Because of its doubtful relevancy, the opinion testimony admitted could not have affected the verdict.

### F.

Defendant argues that the district court erred in refusing to admit into evidence the indictment, guilty plea, and superseding information concerning Sheriff Thomas. Defendant contends that these documents would have shown that Sheriff Thomas had neither been indicted under the Hobbs Act nor convicted of the crime of extortion. Although neither party called Sheriff Thomas as a witness, defendant argues that

> the evidence which the Appellant proposed to have entered into evidence, was being offered as almost a surrogate for the person of Fate Thomas as a witness. The Confrontation Clause and Compulsory Process demanded that this evidence be admitted....

The exclusion of evidence on the grounds of relevancy is within the discretion of the district court. *McLaurin v. Fischer*, 768 F.2d 98, 104 (6th Cir.1985). The proffered evidence had no bearing on the guilt or innocence of defendant and was inadmissible for any impeachment purpose because Sheriff Thomas had not testified. Admission of the evidence concerning Sheriff Thomas' plea would have confused the jury and required instructions from the district court that the evidence was, in essence, irrelevant. This potential for "confusion of the issues, or misleading the jury ... [and] waste of time," Fed.R.Evid. 403, amply justified the court in the exercise of its discretion to exclude this testimony.

### G.

The district court admitted into evidence three charts summarizing the events that occurred on August 22, August 31, and September 8, 1988. The charts consisted of a compilation of information obtained from telephone records, limousine records, surveillances, and tape recordings of the conversations between defendant and William Freeman. In essence, the charts were a chronology of the significant events that occurred on each of those days. Defendant argues that the admission of this evidence was error because the danger of unfair prejudice flowing from these charts outweighed their probative value under Fed. R.Evid. 403.

The admission of summary charts is a matter within the discretion of the district court, *United States v. Campbell*, 845 F.2d 1374, 1381 (6th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 248 (1988), whose decisions in such matters will be upheld absent an abuse of discretion. In *United States v. Scales*, 594 F.2d 558 (6th Cir.), *cert. denied*, 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979), this court exhaustively reviewed the question of the admission of charts as evidence and concluded that Fed.R.Evid. 1006,[1] an "established tradition, both within this circuit and in other circuits," allowed the admission of chart summaries. *Id.* at 563.

Defendant has not shown how the charts in question unfairly prejudiced him. The district court thought they were "classic visual aids" and admitted them to aid the jury in its analysis of the proof in the case. That action was well within the district court's discretion.

### III.

For the foregoing reasons, we AFFIRM the defendant's convictions in all respects but REVERSE defendant's sentence and REMAND for resentencing consistent with this opinion.

JOINER, Senior District Judge, concurring in part and dissenting in part.

I agree that the conviction should be affirmed for all the reasons stated in the majority opinion. However, I would not remand for resentencing. I believe the trial judge was not clearly erroneous in correctly applying section 2C1.1 to increase the offense level by two points. The majority, although paying lip service to the clearly erroneous standard for review, fails, in my judgment, to give due deference to the district judge in this determination. The district judge found that the defendant had obstructed justice and that the false statements to the special agent significantly impeded the government's investigation of the offense. This court should not attempt to second guess the sentencing judge in a case like this. It is wrong not to give credence to the trial judge's finding that the government's assertion of the need for more investigation was impeded by the false statements. It is not for this court to determine when a criminal investigation is ended. I would affirm across the board.

---

1. Rule 1006 provides in pertinent part:
 The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation.