NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0136n.06

Case Nos. 14-5245/5371

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 19, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF KENTUCKY |
| STANLEY LAMONT ANDERSON, JR., and | ) | |
| JOHN THOMPSON, | ) | **OPINION** |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE: GIBBONS and STRANCH, Circuit Judges; REEVES, District Judge.[*]

JULIA SMITH GIBBONS, Circuit Judge.  Stanley Anderson, Jr. and John Thompson pled guilty and were sentenced for their roles in an oxycodone distribution conspiracy, and they now appeal their sentences.  Anderson challenges the district court's assessment of a sentencing enhancement for obstruction of justice and also asserts a constitutional challenge to the court's finding of the number of trips he made to transport drugs.  Thompson challenges the district court's finding of the quantity of oxycodone pills attributable to him, as well as the court's assessment of a sentencing enhancement for obstruction of justice and refusal to grant him credit for acceptance of responsibility.  As explained below, we affirm both defendants' sentences.

I.

In June 2013, a cooperating witness informed the London (Kentucky) Police Department that someone was supplying numerous oxycodone tablets on a daily basis to John Thompson and

---

[*] The Honorable Pamela L. Reeves, United States District Judge for the Eastern District of Tennessee, sitting by designation.

Michael Osborne, both of London. The police initiated surveillance and observed William Scalf visiting Osborne's residence. On June 19, acting at the direction of the police, the cooperating witness purchased fifteen 30-milligram oxycodone tablets from Thompson for $680 and fifteen such tablets from Osborne for $675. The next day, the cooperating witness told police that Scalf would be delivering oxycodone to Thompson at another residence. The police again initiated surveillance and observed Scalf entering and leaving the residence, after which the police arrested Thompson, Osborne, and Scalf, and found Scalf to be in possession of 150 oxycodone tablets.

Scalf agreed to cooperate with police. He told police that he had become involved in drug trafficking through a man known to him only as "Cuz," whom he had met only once in Detroit approximately six months prior. Scalf said that from that point on, he coordinated drug deals with Cuz by telephone and text message, but he met in person only with couriers sent by Cuz approximately every week. The couriers would arrive in Cincinnati by Greyhound bus at 3:30 a.m., meet Scalf in a motel room in northern Kentucky, and sell him between 800 and 1,100 oxycodone tablets on each visit at a price of $23 per tablet. Scalf further told police that he resold 75 oxycodone tablets to Thompson and 75 to Osborne every day at a price of $30 per tablet.

Scalf told police that Cuz would be sending the next courier on June 21. That courier was Stanley Anderson, Jr. After the Greyhound bus from Detroit arrived in Cincinnati at 3:28 a.m., Anderson disembarked and took a cab to a Super 8 Motel in Erlanger, Kentucky. Anderson was then approached by law enforcement, at which time he dropped a bag found to contain 1,195 oxycodone tablets and 400 Xanax tablets, all hidden inside a Pringles can.

Anderson, Thompson, Osborne, and Scalf were indicted for conspiracy to distribute oxycodone in violation of 21 U.S.C. § 846. Thompson and Osborne also were each indicted for distribution of oxycodone in violation of 21 U.S.C. § 841(a)(1). All pled guilty. However, only Scalf negotiated a written plea agreement with the government.

Before sentencing, Anderson and Thompson were each interviewed, as is routine, by the United States Probation Office, which prepared a Presentence Investigation Report (PSR) for each defendant. Anderson told the probation officer that he had made only one trip from Detroit to deliver oxycodone. During an evidentiary hearing, however, Scalf testified that Anderson had made four or five oxycodone deliveries. The court credited Scalf's testimony and found that Anderson was responsible for at least four deliveries. Accordingly, the probation officer recommended, and the district court decided, that Anderson should receive a two-offense-level increase for obstruction of justice, pursuant to U.S.S.G. § 3C1.1. As a result, Anderson had a total offense level of 31, which alongside his criminal history category of I equated to a guideline range of 108 to 135 months. The district court sentenced Anderson to 121 months of imprisonment. On appeal, Anderson challenges the district court's decision to assess a two-level enhancement for obstruction of justice, and he also argues that the court was not constitutionally allowed to judicially find the fact that he had made at least four trips to transport drugs.

In the same evidentiary hearing where Scalf testified that Anderson had made at least four drug runs from Detroit, Scalf also testified about the quantity of drugs that he had sold to Thompson. Scalf testified that starting about five months prior to their arrest, he made five or six deliveries to Thompson every week, of approximately 100 oxycodone pills per delivery. According to Scalf, that pattern continued for approximately three months, until Thompson began work at a road construction company in early April, at which point Scalf's deliveries to

Thompson decreased to 50 or 75 pills about five times per week. But Thompson gave a significantly different accounting of how much oxycodone he received from Scalf. During his interview with the probation officer, Thompson said that he received 20 oxycodone pills from Scalf on one occasion in February 2013, and then from March 1, 2013 to June 16, 2013 received 20 oxycodone pills two or three times weekly. Thompson also acknowledged receiving 70 pills from Scalf on the day of his arrest in June 2013. Again crediting Scalf's testimony, and concluding that Thompson had made false statements about the quantity of oxycodone for which he was responsible, the district court determined that the quantity of oxycodone attributable to Thompson was 8,750 pills (100 pills six times per week for ten weeks through March 2013, and 50 pills five times per week for eleven weeks from April to June 20, 2013). The court accordingly imposed a two-offense-level enhancement on Thompson for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, and denied him any offense-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1. Thompson thus had a final offense level of 34 and criminal history category of III, corresponding to a guideline range of 188 to 235 months. The court sentenced Thompson to 190 months. On appeal, Thompson challenges the court's decisions to impose an enhancement for obstruction of justice and deny him credit for acceptance of responsibility, as well as the court's determination of the drug quantity attributable to him.

## II.

We begin with Thompson's challenge to the district court's finding that 8,750 30-milligram oxycodone pills were attributable to him for sentencing purposes. We review such findings of fact for clear error. *United States v. Russell*, 595 F.3d 633, 646 (6th Cir. 2010). "A factual finding is clearly erroneous where, although there is evidence to support that finding, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Ware*, 282 F.3d 902, 907 (6th Cir. 2002)).

Thompson argues that the district court should not have credited Scalf's testimony about the quantity of pills. Thompson faces an uphill battle in making this argument, as we defer "to the district court on credibility determinations unless they are 'without foundation.'" *United States v. Pruitt*, 156 F.3d 638, 647 (6th Cir. 1998) (quoting *United States v. Lucas*, 889 F.2d 697, 700 (6th Cir. 1989)). Thompson offers two reasons why the district court's assessment of Scalf's credibility was mistaken. First, Thompson points out that the district court suggested in its findings after the evidentiary hearing that his retained counsel may have been paid for using ill-gotten drug profits ("Thompson has retained counsel in this case. While there is no evidence of his fee arrangement, it is fair to assume his attorney does not come cheap. In addressing the argument that Thompson's lifestyle does not reflect that of a drug dealer making substantial profits, the Court is not required to ignore this fact."). Thompson says, however, that the retainer for his attorney was funded by his spouse and her parents. Second, Thompson contends that Scalf's testimony should not have been credited because Scalf had reason to overstate the amount of drugs: he could seek a reduction in his sentence for his substantial assistance in the government's investigation and prosecution.

Neither of these issues, however, undermines the district court's credibility assessment of Scalf such that it is left "without foundation." The district court acknowledged at sentencing that Thompson had introduced evidence that he had used his relatives' money, not drug profits, to pay for his retained counsel, but the court made clear that that had not been the sole basis for its decision to credit Scalf's testimony: the court separately reiterated that Thompson's testimony about drug quantities "wasn't convincing to the Court, and his testimony was not logical." Nor does Scalf's plea agreement and eventual lighter sentence based on his cooperation with the government undermine his credibility. *Cf. Jefferson v. United States*, 730 F.3d 537, 552 (6th Cir.

2013). Although Scalf had a plea agreement in place providing that any "self-incriminating information [he] provided to the government" would "not be used against [Scalf] in the calculation of his guidelines," his only relevant conduct under the plea agreement was the sale on June 20, 2013, and he was held responsible for only the 150 oxycodone pills recovered in that transaction. The district court, which we have repeatedly said is "in the best position to make . . . determination[s]" of witness credibility, *see, e.g.*, *United States v. Hill*, 195 F.3d 258, 264–65 (6th Cir. 1999), noted that overall Thompson had "much more to gain and much less to lose" by his testimony before the court, and found that Thompson's testimony "was offered in an attempt to incorrectly reduce Thompson's guideline sentencing range." The district court additionally noted that Scalf's testimony did not represent an implausibly large amount of oxycodone because, even assuming the defense was correct in its unsubstantiated assertion that Scalf's sales to Thompson and Osborne rivaled the legal prescription sales of pharmacies in the London area, Thompson might have been a street-level dealer as well as a middleman distributing to other dealers. We are left, then, with the fact of Scalf's favorable plea agreement, which does not by itself give us a sufficient basis to conclude that the district court's decision to take Scalf's word on drug quantities over Thompson's was unfounded.

Thompson further argues that the number settled on by the district court—8,750 pills—was baseless because it was not perfectly consistent with Scalf's testimony, even though the court said it was crediting Scalf's word over Thompson's. Thompson points out that Scalf testified to a range of 10,000 to 12,000 pills, not 8,750. But "[w]here the exact amount of drugs involved is unclear," the district court is permitted at sentencing to approximate the quantity of drugs attributable to a defendant, while taking care to "'err on the side of caution.'" *United States v. Valentine*, 694 F.3d 665, 672 (6th Cir. 2012) (quoting *United States v. Hernandez*,

227 F.3d 686, 699 (6th Cir. 2000)). *See also* U.S.S.G. § 2D1.1 cmt. 5 ("Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance."). That is precisely what the district court did here. The district court calculated the total quantity of pills by referring, generally, to the lower end of Scalf's estimates of the volume and frequency of his weekly deliveries to Thompson. For example, the court credited Scalf's testimony that he delivered approximately 100 pills to Thompson six times per week until around the time that Thompson began his construction job in early April 2013—but the court erred on the side of caution by assuming that the 100-pill deliveries stopped by the end of March 2013. The court also credited Scalf's estimate of 50 to 75 pills per delivery to Thompson, at a rate of five deliveries per week, from April until they were arrested in June, but the court again erred on the side of caution by basing its pill quantity calculation on the low-end assumption of 50 pills per delivery for that period. We are satisfied that the district court's approximation of 8,750 oxycodone pills attributable to Thompson is "'supported by competent evidence in the record'" and therefore is not clearly erroneous. *Valentine*, 694 F.3d at 672–73 (quoting *United States v. Mahaffey*, 53 F.3d 128, 132 (6th Cir. 1995)).

III.

Next we consider Thompson's argument that the district court erred by assessing a two-level enhancement for obstruction of justice, pursuant to § 3C1.1. While we review for clear error the district court's factual findings that serve as the basis for its determination that the defendant obstructed justice, we review *de novo* the district court's legal conclusion that those facts constitute obstruction of justice. *United States v. Greco*, 734 F.3d 441, 449 (6th Cir. 2013).

The factual finding that served as the basis for the district court's determination that Thompson obstructed justice was its finding that Scalf had accurately stated the number of pills

he had sold to Thompson, while Thompson had lied to the judge and the probation officer by insisting that he had purchased a far smaller number of pills. As discussed in Part II, *supra*, this factual finding was not clearly erroneous.

Furthermore, the district court was correct as a matter of law to conclude that by lying about the quantity of pills he had purchased, Thompson had obstructed justice within the meaning of § 3C1.1. Committing perjury or otherwise providing materially false information to a judge warrants the enhancement for obstruction of justice, as does providing materially false information to a probation officer during a presentence investigation. U.S.S.G. § 3C1.1 cmt. 4(B), (F), (H). "Perjury occurs when a witness, testifying under oath or affirmation, 'gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *United States v. Lawrence*, 308 F.3d 623, 631–32 (6th Cir. 2002) (quoting *United States v. Dunnigan*, 507 U.S. 87, 94 (1992)). "For a district court to enhance a defendant's sentence under § 3C1.1, the court must: 1) identify those particular portions of defendant's testimony that it considers to be perjurious; and 2) either make a specific finding for each element of perjury or, at least, make a finding that encompasses all of the factual predicates for a finding of perjury." *Lawrence*, 308 F.3d at 632. The district court did precisely this at Thompson's sentencing. The court identified the particular portion of Thompson's testimony that was perjurious: the court stated that Thompson, "in attempting to convince the Court that he was responsible for a lower quantity of drugs, made false statements to the Court directly related to that issue" during his testimony at an evidentiary hearing. Furthermore, the court made specific findings for the elements of perjury: the court noted that Thompson's false testimony was material, because it "directly related to how this Court would calculate drug quantities for each of the defendants," and the court concluded that Thompson had

given false testimony "knowingly" and "intentionally." We see no error in the district court's finding that Thompson obstructed justice.

IV.

Anderson, too, argues that the district court erred in assessing against him a two-level enhancement for obstruction of justice under § 3C1.1. The court imposed the obstruction enhancement because Anderson told the probation officer that he made only one trip from Detroit to deliver drugs, while Scalf's testimony—which the district court credited—was that Anderson had made at least four drug runs. We note that the district court made findings at Anderson's sentencing sufficient to impose the obstruction enhancement. The district court identified the portion of Anderson's statement to the probation officer that it found to be false: Anderson had "insisted that he only made one trip into the district," contrary to Scalf's testimony. The district court further found that Anderson's statement was material because "[t]he number of trips would be directly related to the number of pills that Mr. Anderson would have brought into the district first and foremost, and that would affect his base offense level," and because "if his statement was believed, then it also could possibly qualify him for role reduction." Additionally, the district court found that Anderson's statement "was given to a Court officer intending to influence the decision if believed."

On appeal, Anderson steers a different tack than Thompson in challenging his obstruction enhancement. Although Anderson does not concede that he lied about the number of trips that he made from Detroit, he acknowledges the high bar that he has to overcome to challenge the district court's assessment of his and Scalf's credibility, and thus on appeal he does not raise the factual argument that he was right and Scalf was wrong about the number of trips. Instead, Anderson presents two different arguments. First, citing *United States v. Williams*, 952 F.2d 1504, 1516 (6th Cir. 1991), he says that his statement about the number of trips did not

significantly impede the sentencing process, since the court did not believe him anyway, and therefore he cannot be considered to have obstructed justice. Second, citing *United States v. Hamilton*, 929 F.2d 1126, 1131 (6th Cir. 1991), he argues that his statement was merely a permissible factual dispute during sentencing.

But neither argument is persuasive; the cases Anderson cites are inapposite. Although *Williams* does state that "[t]he focus of [§ 3C1.1] is on whether defendant, by actively making material false statements (and not by a passive refusal to cooperate), *succeeded* in significantly impeding the investigation," 952 F.2d at 1516, that passage specifically addressed Application Note 3(g) of the Guidelines,[1] which stated that providing "a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense" warranted the obstruction enhancement. *Id.*; *see also United States v. Aideyan*, 11 F.3d 74, 76 (6th Cir. 1993) ("*Williams* is inapposite because it concerned falsehoods told to F.B.I. agents during an investigation."). By contrast, § 3C1.1 cmt. 4(H), which states that an obstruction enhancement is appropriate where the defendant has "provid[ed] materially false information to a probation officer in respect to a pre-sentence or other investigation for the court," does not require that the false information impede any investigation. *See Aideyan*, 11 F.3d at 76. It is enough that the information be false and that it be material, as the district court correctly found it to be in this case.

Anderson's reliance on *Hamilton* is similarly misplaced. Section 3C1.1 does not prevent a defendant from "contest[ing] the applicability of specific guideline provisions": in *Hamilton*, for example, the defendant was allowed to argue "that he merely 'brandished,' rather than 'otherwise used,' a weapon" without facing an obstruction enhancement. *Hamilton*, 929 F.2d at

---

[1] The identical provision can be found in the current Guidelines Manual at § 3C1.1 cmt. 4(G).

1131. That right, however, "is not so broad as to entitle that defendant to perjure himself." *Id.* The court credited Scalf's testimony that Anderson had made at least four trips from Detroit—a finding that Anderson does not contest on appeal—and found that Anderson lied when he told the probation officer that he had made only one trip. This was materially false information and the district court did not err in imposing the § 3C1.1 obstruction-of-justice enhancement on Anderson.

V.

In a separately-filed *pro se* brief, Anderson also seeks to challenge his sentence under the Sixth Amendment cases *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 133 S.Ct. 2151 (2013). Anderson is ably represented by counsel, who had already filed a brief in his appeal, and criminal defendants do not have a constitutional right to "hybrid representation," *United States v. Mosely*, 810 F.2d 93, 98 (6th Cir. 1987), so we are under no obligation to address Anderson's pro se supplemental brief. *United States v. Williams*, 641 F.3d 758, 770 (6th Cir. 2011). Nevertheless, we will exercise our discretion to do so, to make clear that Anderson's arguments are without merit. *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. Extending *Apprendi*, *Alleyne* held that "[a]ny fact that, by law, increases the penalty for a crime"—including a fact that increases the applicable mandatory minimum sentence—"is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." 133 S.Ct. at 2156. Anderson contends that the court in his case "could not have imposed the sentence it did, without making the factual finding" from the bench that he had transported oxycodone on at least four occasions, not merely the one occasion that he admitted in his guilty plea; therefore, Anderson argues, *Apprendi* and *Alleyne* were violated. This argument misses the mark.

"*Alleyne* did not extend *Apprendi* to facts that do not increase the prescribed statutory penalties." *United States v. Johnson*, 732 F.3d 577, 584 (6th Cir. 2013). "[J]udge-found facts that trigger an increased guidelines range" remain constitutionally permissible. *United States v. Cooper*, 739 F.3d 873, 884 (6th Cir. 2014). Here, the district court's judicial factfinding of the quantity of oxycodone attributable to Anderson did affect his sentencing guideline range, but it did not affect the statutory mandatory minimum penalty (none) or the statutory maximum penalty (twenty years). *See* 21 U.S.C. § 841(b)(1)(C) (setting out penalties for Schedule I and II controlled substances); 21 C.F.R. § 1308.12 (identifying oxycodone as a Schedule II controlled substance). Thus *Apprendi* and *Alleyne* were not violated.

VI.

We return to Thompson, whose final contention is that the district court should have granted him an offense-level reduction for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1. We review for clear error the district court's decision to deny Thompson credit for acceptance of responsibility.[2] *United States v. Denson*, 728 F.3d 603, 614 (6th Cir. 2013). *See also* U.S.S.G. § 3E1.1 cmt. 5 ("The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review."). Under § 3E1.1(a), the defendant must "clearly demonstrate[] acceptance of responsibility for his offense" in order to qualify for the offense-level reduction. "[A] defendant who falsely denies . . . relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1 cmt. 1(A). This court has upheld a district court's refusal to give the defendant credit for

---

[2] In situations where "'the only issue presented is the propriety of applying the reduction to the uncontested facts,'" however, "'the decision is reviewed *de novo*.'" *Denson*, 728 F.3d at 614 (quoting *United States v. Coss*, 677 F.3d 278, 290 (6th Cir. 2012)). Here, the facts are not uncontested; indeed, the gravamen of Thompson's argument is that he, not Scalf, stated the correct number of oxycodone pills.

acceptance of responsibility, even though the defendant pled guilty, where the defendant "denied . . . the amount of controlled substances for which he was accountable and the scope of his involvement in the criminal enterprise." *United States v. Dempsey*, 26 F. App'x 464, 468 (6th Cir. 2001) (citing *Mahaffey*, 53 F.3d at 134–35). As discussed above, the district court found that Thompson was responsible for at least 8,750 pills, and this finding was not clearly erroneous. Thompson denied that quantity and insisted that he was responsible for a much lower quantity, on the order of fewer than 1,000 pills; the district court therefore did not clearly err in denying him credit for acceptance of responsibility.

## VII.

For the above reasons Anderson's sentence and Thompson's sentence are both affirmed.