7 F.3d 235
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Christian Ferguson GARY and Steven Darryl Cheeks,
Defendants-Appellees.
 Nos. 92-2029, 92-2202.
 United States Court of Appeals, Sixth Circuit.
 Sept. 14, 1993.
 
 On Appeal from the United States District Court, for the Eastern District of Michigan, No. 91-80510; Cohn, Judge.
 E.D.Mich.
 AFFIRMED.
 Before: KENNEDY and RYAN, Circuit Judges; and KRUPANSKY, Senior Circuit Judge.
 RYAN, Circuit Judge.
 
 
 1
 The defendants, Christian Gary and Steven Cheeks, appeal from the judgments and sentences imposed following jury convictions on various drug and firearm counts. On appeal, both defendants challenge their convictions with an argument that their due process rights were impaired because a government witness lied on the stand. In addition, defendant Gary contends that there was plain error in the district court's failure to explicitly instruct the jury on Gary's theory of defense. Finally, both defendants argue that the district court plainly erred in finding, for sentencing purposes, that the defendants were responsible for undistributed amounts of cocaine.
 
 
 2
 For the reasons that follow, we shall affirm both the judgment of conviction and the sentence of each defendant.
 
 I.
 
 3
 In July 1991, a grand jury in the Eastern District of Michigan issued a nine-count indictment charging Steven Cheeks and Christian Gary, along with three others not party to this appeal,[1] with drug and firearms violations. Gary was charged with one count each of conspiracy to possess "crack" cocaine with intent to distribute, and conspiracy to distribute crack, in violation of 21 U.S.C. § 846; distribution of cocaine base, and aiding and abetting thereof, on May 16, 1991, in violation of 21 U.S.C. § 841(a)(1) & 18 U.S.C. § 2;[2] possession of cocaine base with intent to distribute, on June 6, 1991, in violation of 18 U.S.C. § 841(a)(1); and use of a firearm during a drug trafficking offense, on June 6, 1991, in violation of 18 U.S.C. § 924(c). Cheeks was charged with one count of conspiracy to possess crack with intent to distribute, and conspiracy to distribute crack, in violation of 21 U.S.C. § 846; two counts of distribution of cocaine base, and aiding and abetting thereof, on May 16 and May 21, 1991, in violation of 21 U.S.C. § 841(a)(1) & 18 U.S.C. § 2;[3] and one count of use of a firearm during a drug trafficking offense, on May 21, 1991, in violation of 18 U.S.C. § 924(c). The case originally proceeded to trial in December 1991, but the result was a hung jury as to Gary. Because Cheeks was a fugitive at the time, he was not tried at the first trial. A second trial of both Cheeks and Gary, from which these appeals were taken, commenced in April 1992.
 
 
 4
 Sometime in 1990 or 1991, Christian Gary approached Yolanda Morris, the owner of a house at 15846 Hazelton in Detroit, and asked to sell drugs from the residence. She allowed him to use her house, and helped him sell drugs, in exchange for half of the income from the trafficking. Morris testified, as did Lulu Horn, who also lived at the house, that in addition to drug trafficking, the house was the frequent scene of gambling, drinking, pot-smoking, and loud parties. Often up to ten or twelve people would be at the house, not all of whom were drug traffickers.
 
 
 5
 In May 1991, various complaints from neighbors and the report of a confidential informant led to a joint Detroit Police/ATF investigation of possible drug activity at 15846 Hazelton. ATF Special Agent Joseph Slatalla acted as an undercover agent in the investigation, and first attempted to buy crack from the address on May 16. As he indicated at trial, he knocked on the back door and saw Morris through the storm door. She motioned him inside and asked what he wanted, and he told her he wanted two rocks of crack. Also inside the kitchen were Gary and Cheeks, and Gary asked Slatalla who he was. Slatalla responded that his name was Joe, and told Gary that he had been to the house before. Gary looked him over and told Morris that Slatalla was "all right." Slatalla then gave Gary $40.00, and Gary and Cheeks left the room to go get the drugs. Morris remained in the kitchen with Slatalla. Cheeks then returned and told Morris, "Yo-Yo, can't find it." Leaving Cheeks behind to wait with Slatalla, Morris then left the room. Returning moments later with Gary, she gave two rocks of crack to Slatalla.
 
 
 6
 In his report on this aspect of the investigation, however, Slatalla indicated that he purchased three, not two, rocks of crack on this visit. At trial, he testified that he had prepared his report in this manner in order to conceal the fact that he had been accompanied by a confidential informant, who purchased a single rock for $20.00. Thus, by claiming to have purchased all three rocks himself, he was able to account for the physical evidence he processed without having to reveal the presence of the CI.
 
 
 7
 On May 21, Slatalla returned to the house, and found Shepherd Davis and Cheeks alone. Slatalla indicated he wanted to purchase seven rocks, and Davis, in retrieving the drugs, revealed a package containing approximately 60 rocks of cocaine. Slatalla paid $140.00 for the seven rocks. Slatalla then told Davis and Cheeks, gesturing with his hands, that he wanted to buy a "big ball," to which Cheeks responded, "well, that looks about a half ounce you want." Cheeks told him that half an ounce would cost "about 300, $350.00," but that Slatalla would have to "call ahead to get that much." Slatalla left his beeper number with the two men, and they told him that "Chris w[ould] get a hold of [him] if he could set [him] straight...."
 
 
 8
 On May 24, Slatalla returned to the house, and this time bought two rocks of crack for $30.00 from Lulu Horn. Slatalla repeated that he would like to purchase a large amount, and Horn indicated that she had heard about his interest, asking "well, your [sic] the guy who wanted this, right?" She too told him, however, that "Chris w[ould] have to set [him] up for that...." On May 28, Slatalla went to the house and spoke again with Horn. He told her he had $150.00 to spend, and she showed him a box containing 60 or 70 rocks of crack. They negotiated, and she gave him eight large rocks and one small rock for his money. He mentioned anew his desire to buy a larger amount, and she asked him if she was interested in "an eight ball." He told her no, that he wanted "a big ball, a half ounce," to which she replied that "Chris hadn't been around in a little while but he pops in and out and he [would] get a hold [sic] of [Slatalla] if he can set [him] up." Slatalla's final purchase was of two more rocks of crack for $25.00 from Horn on June 3. He was never called by anyone named Chris with regard to a larger purchase.
 
 
 9
 The defendants were arrested on August 22, 1991. Gary was sitting on the living room sofa at the time of the arrest; a gun was leaning against the sofa, and a plastic bag containing crack cocaine was several feet away. An unspecified number of other people were also in the house. Slatalla testified that Gary orally confessed to having sold him cocaine after his arrest, but according to Slatalla, he had no time to get a written confession from him because the magistrate judge insisted that the defendant be brought before the court immediately.
 
 
 10
 At trial, a great deal of Slatalla's testimony was devoted to explaining his failure to mention the CI in his report regarding the events of May 16. Slatalla justified himself as follows:
 
 
 11
 A I didn't include any information regarding the confidential informant in that report.
 
 
 12
 Q Why not?
 
 
 13
 A For several reasons, but primarily for the informant's safety.
 
 
 14
 Secondarily, because it was the first undercover purchase in what was projected to be a long-term investigation.... And having conducted numerous of these investigations, I felt it wasn't necessary to include the confidential informant information.
 
 
 15
 The defendants contend that in the following colloquy, elicited during cross-examination, Slatalla answered so misleadingly that the defendants were effectively denied due process:
 
 
 16
 Q Now in this case, sir, am I correct in saying that you did not even tell the U.S. Attorney about the existence of a confidential informant until moments before the first trial in this case, back in last December?
 
 
 17
 A That's not an accurate statement, no.
 
 
 18
 Q That's inaccurate?
 
 
 19
 A. That's an inaccurate statement.
 
 
 20
 Q All right.
 
 
 21
 You didn't tell the U.S. Attorney about two or three days before trial that there was a confidential informant for the first time?
 
 
 22
 A No, I did not.
 
 
 23
 Q All right.
 
 
 24
 So if the U.S. Attorney were to get up and say that he in fact--that you in fact told him that for the first time three days before trial in this case, it would be your testimony that the U.S. Attorney is lying?
 
 
 25
 A The limited way of presenting it, that's correct. Your statement is correct.
 
 
 26
 Q Thank you, sir.
 
 
 27
 Your position is he would be lying?
 
 
 28
 A That's not my position at all.
 
 
 29
 After Slatalla's testimony, the district judge gave the following assessment of the agent:
 
 
 30
 I continue to be dissatisfied with the performance of the Bureau in this case, including the testimony of the witness. His testimony has not improved since the last trial. He continues to dissemble.
 
 
 31
 I make that statement on the record, out of the presence of the jury. I am not satisfied that this witness was an honest and forthright witness.... That witness' testimony about protecting the safety of the confidential informant is not worthy of belief....
 
 
 32
 This case represents a disgrace to the criminal justice system and law enforcement by the federal government. It will go on though, sir, because I don't believe it constitutes misconduct. But as far as I'm concerned, this is a disgraceful episode in law enforcement.
 
 
 33
 The AUSA confirmed to the district judge that he had in fact learned about the existence of the CI only three days before the case originally went to trial, and that as a result, he had to dismiss the count relating to May 16. However, it was another ATF agent--not Slatalla--that told the AUSA about the informant in December, after having been reminded about the CI by Slatalla.
 
 
 34
 Despite his negative evaluation of Slatalla, the judge permitted the AUSA to comment favorably in his closing rebuttal argument as to Slatalla's credibility. And later, in denying the defendants' motion for acquittal or new trial, the judge exhibited a change of heart with regard to the agent:
 
 
 35
 I made some comments about the way he testified, not necessarily with credibility.... While I commented adversely on Agent Slatalla's testimony, I don't think that it went to his credibility of whether or not he was, in fact, telling the truth about what occurred on May 16th.
 
 
 36
 My comment was directed to his failure to honestly admit a mistake.
 
 
 37
 Gary was convicted on all three counts with which he was charged, excepting the count that had previously been dismissed by the government. Cheeks was found not guilty of the firearm count, but was convicted on the two remaining drug counts, again excepting the count that had been dismissed.
 
 
 38
 In the presentence investigation reports (PSRs), both defendants were assigned a total offense level of 28, based on the amount of cocaine base for which the defendants were deemed responsible for distributing. In his calculations, the probation officer included the 5.47 grams that were actually sold to agent Slatalla; the approximately 9.9 grams that were seized at the time of arrest; and 14.17 grams that, because of Slatalla's repeated requests to purchase a one-half ounce ball, were deemed to have been "under negotiation." The defendants made no objection to this aspect of the PSRs, and the amount of cocaine for which they were responsible was not explicitly discussed or addressed at sentencing.
 
 
 39
 With a total offense level of 28 and a criminal history category of II, Gary's resulting sentencing range was 87 to 108 months on the drug charges, and 60 months on the firearm charges. He received a sentence of 87 months imprisonment on each of the drug counts, to run concurrently, and of 60 months on the firearm count, to run consecutively. He also received a total of four years supervised release, and was assessed $150.00 on each of the three counts.
 
 
 40
 With a total offense level of 28 and a criminal history category of V, Cheeks had a sentencing range of 130 to 162 months. He was sentenced to 130 months imprisonment on the two counts, to run concurrently, and four years supervised release. In addition, the court imposed a $100.00 special assessment on each count.
 
 
 41
 The defendants filed timely appeals.
 
 II.
 A.
 
 42
 Both defendants argue that in testifying that he had not told the AUSA about the presence of the CI until shortly before trial, Slatalla lied under oath; that the AUSA knew Slatalla lied under oath and failed to correct it; that the AUSA further compounded this failure by arguing that Slatalla was a credible witness; and that as a result, the convictions were obtained through the use of false evidence. In response, the government argues simply that the agent did not lie, pointing out that "[n]owhere in the transcript did the [AUSA] state that it was Agent Slatalla who conveyed th[e] information" regarding the CI prior to trial. In other words, because Slatalla in fact never told the AUSA about the CI, Slatalla was not lying when he denied having told the AUSA about the CI only three days before trial.
 
 
 43
 The defendants rely on a line of cases commencing with Napue v. Illinois, 360 U.S. 264 (1959), and Giglio v. United States, 405 U.S. 150 (1972), in which the Supreme Court held that a conviction obtained through use of false evidence, not solicited by the prosecutor yet known by him to be false and left uncorrected, is a violation of a defendant's due process rights under the Fourteenth Amendment. Napue, 360 U.S. at 269. This is true even if "the false testimony goes only to the credibility of the witness." Id. So long as the false evidence is material, a new trial should be held. Giglio, 405 U.S. at 154. To successfully make out this type of claim, the burden is on the defendant to establish the existence of three factors: (1) that the statement was actually false; (2) that the statement was material; and (3) that the prosecution knew the statement was false. United States v. Lochmondy, 890 F.2d 817, 822 (6th Cir.1989).
 
 
 44
 The record reveals that the government is correct: Slatalla uttered no false statement in the testimony of which the defendants complain. Therefore, the defendants have failed to meet the first requirement of Lochmondy: demonstrating that a statement was actually false. Thus, this argument does not present a basis for reversing the convictions.
 
 B.
 
 45
 The court instructed the jury as follows, in connection with the possession-with-intent count:
 
 
 46
 For example, if you left something with a friend while you went away, intending to take it back or send someone to get it for you when you returned, your friend would have actual possession and you would have constructive possession while you were gone.
 
 
 47
 But understand that just being present where something is located does not equal possession. The Government must prove that a Defendant had actual or constructive possession of the crack cocaine, and knew that he did, for you to find him guilty of this crime.
 
 
 48
 (Emphasis added). The court also referred to similar concepts on several other occasions. It cautioned, for example, that in finding an agreement between the defendants, "proof that people simply met together from time to time and talked about common interests, or engaged in similar conduct, is not enough."
 
 
 49
 Gary argues, however, that the district court erred in failing to give the following instruction, conveying his theory of defense:
 
 
 50
 Mere presence at the scene of the crime and knowledge that a crime is being committed are not sufficient to establish that the defendant aided and abetted the crime, unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.
 
 
 51
 Gary argues that he was merely present in the house for the purpose of "partying," but was not engaged in drug trafficking, and that the instructions given by the court did not adequately present this theory as a basis for acquittal. Gary, however, failed to suggest to the district court that it give the instruction to which he now points, and likewise failed to object to the instructions that were given.
 
 
 52
 We review the jury charge as a whole to see if it fairly and adequately submits the issues and the law to the jury. United States v. Williams, 952 F.2d 1504, 1512 (6th Cir.1991). So long as there is even weak supporting evidence for an instruction, "[a] trial court commits reversible error in a criminal case when it fails to give an adequate presentation of a theory of defense." United States v. Plummer, 789 F.2d 435, 438 (6th Cir.1986). Thus, a refusal to give requested instructions is reversible error if (1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the defendant's theory of the case. Williams, 952 F.2d at 1512. However, a defendant waives his right to object to the court's failure to give certain instructions by "failing to present distinct and clear objections with regard to those instructions." United States v. Sturman, 951 F.2d 1466, 1488 (6th Cir.1991), cert. denied, 112 S.Ct. 2964 (1992). Under these circumstances, a defendant "may not obtain review of the instructions to the jury on appeal absent plain error.... Plain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." United States v. Piccolo, 723 F.2d 1234, 1241 (6th Cir.1983), cert. denied, 466 U.S. 970 (1984). "[A]n improper jury instruction will rarely justify reversal of a criminal conviction when no objection has been made at trial, ... and an omitted or incomplete instruction is even less likely to justify reversal, since such an instruction is not as prejudicial as a misstatement of the law...." United States v. Hook, 781 F.2d 1166, 1172-73 (6th Cir.), cert. denied, 479 U.S. 882 (1986) (citations omitted).
 
 
 53
 It is readily apparent that it was not plain error for the court to fail to give the instruction when it was not requested. The overwhelming evidence of Gary's guilt, in concert with the sparse evidence from which a jury could reasonably conclude that he was only in the house for the purpose of socializing, leads us to conclude that the brief instructions the court did give on the mere-presence doctrine resulted in an adequate presentation of Gary's defense.
 
 C.
 
 54
 The final argument made by the defendants is that they were improperly sentenced. Slatalla purchased 5.47 grams of cocaine, and approximately 9.9 grams were seized at the time of the search. In addition to this 15.37 grams, the PSRs assigned the defendants responsibility for 14.17 grams that were "under negotiation." The defendants concede that no objection was made to the PSRs, but argue that it was error to include the allegedly negotiated amount, because in reality, there were no negotiations.
 
 
 55
 A district court's determination of the quantity of drugs under U.S.S.G. § 2D1.4 for the purposes of computing a defendant's sentence is a finding of fact that should not be rejected unless clearly erroneous. United States v. Paulino, 935 F.2d 739, 756 (6th Cir.), cert. denied, 112 S.Ct. 315, and cert. denied, 112 S.Ct. 323, and cert. denied, 112 S.Ct. 660 (1991), and cert. denied, 112 S.Ct. 883 (1992). The government must prove the quantity of drugs involved in an illegal transaction by a preponderance of the evidence. United States v. Hodges, 935 F.2d 766, 774 (6th Cir.), cert. denied, 112 S.Ct. 251, and cert. denied, 112 S.Ct. 317 (1991). Conduct beyond the count of conviction may be considered at the sentencing level, United States v. Moreno, 899 F.2d 465, 473 (6th Cir.1990), and a defendant who is involved in a conspiracy may be held accountable for any quantity of which he is aware or which is reasonably foreseeable to him, Hodges, 935 F.2d at 770. A defendant is, therefore, responsible for "conversational cocaine"--that is, drugs that were discussed as part of a deal that never came to fruition--if the court "concludes that defendant had the intention to produce or was reasonably capable of producing" the stated amount of drugs. United States v. Gessa, 971 F.2d 1257, 1265 (6th Cir.1992) (en banc).
 
 
 56
 When a defendant fails, however, to raise a sentencing guideline challenge to the district court, this court ordinarily will not address the issue absent a showing of plain error or manifest injustice. See United States v. Nagi, 947 F.2d 211, 213 (6th Cir.1991), cert. denied, 112 S.Ct. 2309 (1992). In Nagi, this court pointed out that the defendants had failed to first present their claim to the district court that the wrong version of the guidelines had been applied, and concluded that "the district court's failure to address the asserted misapplication is not 'plain error' because both sides agreed to the application of the October Guidelines." Id.; cf. United States v. Olano, 113 S.Ct. 1770, 1776-77 (1993).
 
 
 57
 The PSRs made quite apparent the basis for its conclusions on the amount of cocaine for which the defendants were responsible, and it should have been evident to the defendants that the half-ounce was being treated as an amount under negotiation. The defendants had the right to file objections to this report, and did not. The defendants have, therefore, waived this argument.
 
 
 58
 We find no basis for finding that the inclusion of the 14.17 grams was plain error. In response to Slatalla's inquiries, Davis and Cheeks suggested that he would be interested in a half-ounce purchase; gave him the name of the contact person; and named an approximate purchase price. Slatalla was allowed to leave his beeper number, and was informed that he would be contacted by the man who could "set him up." The evidence indicates that his initial request to Cheeks and Davis was taken sufficiently seriously as to be discussed among the members of the conspiracy, because three days later, Horn indicated that she had heard about the desired purchase. No one to whom he spoke ever discouraged him or indicated that the purchase of such a large amount was impossible or even improbable. In light of all this evidence, we cannot conclude that the court's assessment was plainly erroneous.
 
 III.
 
 59
 AFFIRMED.
 
 
 
 [1]
 Also indicted were Yolanda Morris; Lulu Horn; and Shepherd Davis. Morris testified against the codefendants in return for a Rule 11 plea agreement, and received a sentence of three years' probation. Horn, underage at the time of the arrest, was granted use immunity in return for her testimony against the codefendants. Davis was found guilty at the first trial in this case
 
 
 [2]
 This count was dismissed by the government when the Assistant U.S. Attorney learned, three days prior to the first trial, that the ATF undercover agent assigned to the case had concealed the fact that a confidential informant accompanied him to the defendants' house on May 16. This count arose out of that visit
 
 
 [3]
 As with Gary, the government dismissed the count against Cheeks relating to May 16