NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0652n.06
Filed: September 5 , 2007

No. 05-1929

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| EARL BRADLEY BOOKER, | ) | WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| Appellant. | ) | |

Before: GIBBONS and SUTTON, Circuit Judges; BECKWITH, District Judge.[*]

SUTTON, Circuit Judge. A federal jury convicted Earl Booker of violating the felon-in-possession-of-a-gun statute, *see* 18 U.S.C. § 922(g)(1), and acquitted him of a drug-possession charge. Because Booker's challenges to his conviction and sentence are unconvincing, we affirm.

I.

On the evening of July 11, 2004, Earl Bradley Booker drove his father's car to pick up his friend Anthony Webb to attend a party in Moline, Michigan. On the way to the party, Booker and Webb picked up Morgan Hoye, one of Webb's girlfriends. After spending some time at the party, the group went to a local bar.

_____

[*] The Honorable Sandra S. Beckwith, Chief Judge, United States District Court for the Southern District of Ohio, sitting by designation.

Booker, Webb and Hoye left the bar in the early morning hours of July 12, with Booker driving and Webb and Hoye sitting together in the back. While stopped at a red light, Webb opened his door and vomited, drawing the attention of Officer Timothy Pols who was on patrol. Webb closed the door after the light changed green, and Booker pulled the car into a nearby parking lot to check on Webb. Officer Pols followed him while turning on his overhead lights.

At that point, Webb asked Booker, "Do you know where the gun is at?" and Booker tossed the handgun onto the floor of the back seat. JA 152. When Officer Pols reached the car, he saw "beer cans . . . scattered throughout the rear seat of the vehicle" and a "short-barreled revolver" ("silver with a black handle") on the car floor near Webb. JA 212. Officer Pols "drew [his] own weapon," returned to his cruiser and radioed for backup. JA 213.

Meanwhile, Webb returned the gun to Booker, who put it in the glove box, locked the glove box and threw the keys toward the back seat. When Officer Pols returned to the car, he ordered the three to place their hands on the ceiling of the car and secured them in handcuffs after backup officers arrived. Officer Pols searched the vehicle, recovering the handgun and some crack cocaine from the locked glove box.

A federal grand jury indicted Booker for possessing a firearm after having been convicted of a felony, *see* 18 U.S.C. § 922(g)(1), and for possessing crack cocaine, *see* 21 U.S.C. § 844(a). Booker pleaded not guilty to both charges and requested a jury trial. The jury convicted Booker of the felon-in-possession charge and acquitted him of the drug-possession charge.

The district court calculated a guidelines range of 77–96 months, rejected Booker's motion for a departure under Sentencing Guideline § 5K2.0 and recognized that it had to "determine whether Section 3553(a) sentencing factors dictate a sentence different from the advisory guideline range." JA 295. Relying on, among other factors, Booker's 14 convictions within the span of 7 years and the "unspoken demand to protect the public from somebody like [Booker] who repeatedly commits the same crime," JA 310, the district court sentenced Booker to 88 months' imprisonment.

## II.

Claiming that the evidence does not show that he possessed the gun, Booker argues that the evidence does not support the verdict. When viewed "in the light most favorable to the government," however, the evidence would allow a reasonable jury to find otherwise beyond a reasonable doubt. *See United States v. Arnold*, 486 F.3d 177, 180 (6th Cir. 2007) (en banc).

Hoye testified that, when Officer Pols followed the trio into the parking lot, Booker tossed the handgun to Webb and that, once Officer Pols returned to his vehicle, Webb tossed the gun back to Booker, who locked it in the glove box. Webb testified that he had seen the gun in the glove box earlier in the evening, that he tossed the gun to Booker and told him to "put it in the glove box," JA 183, and that Booker did so. Officer Pols confirmed that, after seeing the gun beneath Webb's feet, he found the gun in the locked glove box and that neither Webb nor Hoye leaned over the front seat while he radioed for help, which would have been necessary if either of them had accessed the glove box from the back seat.

Booker counters that the jury should have rejected the "incredible testimony of the gun-toting Webb and his lover" Hoye, whose "testimony was impeached over and over again." Br. at 47. But the reality is that the jury apparently *did* credit the accounts of Webb and Hoye—and did so permissibly, as these accounts were internally coherent and consistent with the testimony of Officer Pols. As much as Booker would like us to function as a thirteenth juror, that is not our place. *See Jackson v. Virginia*, 443 U.S. 307, 319–20 (1979) (A court should not "ask itself whether *it* believes that the evidence at the trial" was sufficient, but instead if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.") (internal quotation marks omitted).

Booker next contends that the jury venire "excluded members of distinct groups" and did not "represent[] a fair cross section of the community"—particularly African Americans and Hispanics—in violation of the Equal Protection Clause, the Sixth Amendment and the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861 *et seq.* Br. at 15; *see Duren v. Missouri*, 439 U.S. 357, 363–70 (1979). To establish a prima facie violation of the fair-cross-section right, Booker "must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires . . . is not fair and reasonable . . . ; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren*, 439 U.S. at 364; *see also* 28 U.S.C. § 1862; *United States v. Ovalle*, 136 F.3d 1092, 1099 (6th Cir. 1998) ("Typically, challenges brought under the JSSA are reviewed under the same standard as a Sixth Amendment claim of denial of a jury representing a fair cross section of the community . . . .").

Booker cannot satisfy these requirements. He has not shown, for starters, that the representation of either group was not "fair and reasonable," *Duren*, 439 U.S. at 364, which is to say, that either of these groups was "substantially underrepresented" in the jury wheel, *Castaneda v. Partida*, 430 U.S. 482, 495 n.14 (1977). The numbers tell the story: 7.6% of the potential jury pool was African American, while 4.97% of the jury wheel was African American. Two percent of potential jurors in Michigan are Hispanic, *see* U.S. Census Bureau, Voting and Registration in the Election of November 2004, tbl.4c, *available at* http://www.census.gov/population/www/socdemo/ voting/cps2004.html, while 1.64% of the jurors on the wheel reported themselves to be Hispanic (35% did not identify whether they were Hispanic or not). These numbers—suggesting at most a 2.63% disparity for African Americans and a 0.36% disparity for Hispanics—are a far cry from the substantial disparities found to constitute a violation of the fair-cross-section requirement in the leading cases. *See Duren*, 439 U.S. at 364–66 (holding that a 38% disparity was a "gross discrepancy" suggesting that "women were not fairly represented" when women comprised 54% of the populace but only 15% of the jury venire); *Castaneda*, 430 U.S. at 486–87 (40% disparity— Mexican Americans made up 79.1% of potential grand jurors but only 39% of actual grand jurors); *Taylor v. Louisiana*, 419 U.S. 522, 524 (1975) (43% disparity—"53% of the persons eligible for jury service . . . were female, and . . . no more than 10% of the persons on the jury wheel . . . were women"); *Turner v. Fouche*, 396 U.S. 346, 349, 359 (1970) (23% disparity—African Americans made up 60% of the population and only 37% of the list from which the grand jury was drawn); *Whitus v. Georgia*, 385 U.S. 545, 552 (1967) (18% disparity—African Americans made up 27.1% of local taxpayers but only 9.1% of the grand jury venire). *Compare Jefferson v. Morgan*, 962 F.2d

1185, 1189 (6th Cir. 1992) (holding that a 12.6% disparity, with African Americans comprising 18.5% of the populace but only 5.9% of grand jurors, was "sufficiently large" to establish unlawful discrimination), *with Ford v. Seabold*, 841 F.2d 677, 688 (6th Cir. 1988) (suggesting that a 4% disparity, with "nonwhites" comprising "9% of the persons living in the county" and 5% of actual jurors, was constitutionally "insignificant").

Booker also has not shown that any disparity stems from "systematic exclusion" rather than happenstance. *Duren*, 439 U.S. at 366. The disparity is not so large that "it is unlikely that it is due solely to chance or accident," *Castaneda*, 430 U.S. at 494 n.13, and he has not shown that "a large discrepancy occurred not just occasionally but in every weekly venire for a period of nearly a year," *Duren*, 439 U.S. at 366. Nor has he shown that the system of jury selection in the district facially targets one of the underrepresented groups, is "highly subjective" or is "susceptible of abuse as applied." *Castaneda*, 430 U.S. at 497.

Booker responds that the system discriminates against African Americans and Hispanics by relying on voter-registration rolls because "black and Hispanic people register to vote at levels below that of whites." Br. at 26. But Booker ignores the statutory requirement that juror-selection plans use such lists, *see* 28 U.S.C. § 1863(b)(2) (The plan must "specify whether the names of prospective jurors shall be selected from the voter registration lists or the lists of actual voters . . . ."), a requirement that he challenged neither below nor on appeal. Perhaps more importantly, the juror-selection plan attempts to mitigate any such disparities by drawing names from state driver's license and identification records, *see* 28 U.S.C. § 1863(b)(2) ("The plan shall prescribe some other

source . . . of names in addition to voter lists where necessary to foster the policy and protect the rights secured by [sections 1861 and 1862 of the Act].")—a feature of the plan that is consistent with systematic *inclusion* rather than exclusion.

To the extent Booker also contends that the district court "completely excluded" elderly citizens and students from the jury venire in violation of Booker's Fifth and Sixth Amendment rights, Br. at 19, he misreads the record. While the district court said that it "automatically exclude[d] anybody that's over 70" as well as "full-time students," it did so in the context of explaining how it handled "requests for dismissal." JA 116. Booker, at any rate, never raised this objection below, limiting us to plain-error review. *See* Fed. R. Crim. P. 52(b). Booker has not shown that citizens engaged in full-time study or citizens over 70 years old represent distinct communities of interests, *cf. Taylor*, 419 U.S. at 531, nor shown that either group is substantially underrepresented on jury venires, nor shown that granting these dismissal requests broaches the prohibitions of the Jury Selection and Service Act. He thus has not shown that the district court erred, much less shown that the alleged error was "plain" or that it "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997).

Booker next alleges that the district court made two errors in instructing the jury: first when it denied his "fleeting possession" instruction, then when it instructed the jury regarding Booker's prior felony conviction. The district court must "fairly and adequately" instruct the jury on "the issues and applicable law," *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991), and "may

not charge the jury upon a supposed or conjectural state of facts, of which no evidence has been offered," *Quercia v. United States*, 289 U.S. 466, 470 (1933) (internal quotation marks omitted); *see United States v. James*, 819 F.2d 674, 675 (6th Cir. 1987). If a party asks for a jury instruction, the district court must give it if it is legally proper, is "not substantially covered by the charge actually delivered to the jury" and "concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *Williams*, 952 F.2d at 1512; *see also United States v. Newcomb*, 6 F.3d 1129, 1132 (6th Cir. 1993).

Booker asked the district court to instruct the jury that, "[i]f you find that Mr. Booker only momentarily possessed the gun without knowledge that it was a gun or without criminal intent to possess it, you must find him not guilty on Count I." JA 19. Even if we assume for the sake of argument that this instruction is a proper one, *see United States v. Hargrove*, 416 F.3d 486, 489 (6th Cir. 2005) (noting that "a defendant in a prosecution for possession of a firearm as a felon may assert the defense of necessity or justification" but "only in rare situations" because such a defense "should be construed very narrowly"), the fact remains that Booker never introduced any evidence to support it. Based on the testimony of Officer Pols, whose veracity Booker does not challenge, we know that when the officer first arrived the gun was in the back seat, that the gun was eventually found locked in the car's glove box and that neither Webb nor Hoye (who were both sitting in the back seat) reached over the front seat to access the glove box in the meantime. The only possible inference from these facts is that Booker himself placed (and locked) the gun in the glove box, which suggests that Booker knew that the gun was in fact a gun and that he did not want Officer Pols to find it.

While Booker on appeal tries to avoid this inference by suggesting that he "was under an unlawful and imminent threat of death," Br. at 29, he placed no evidence to that effect before the jury. The district court did not err in rejecting this instruction.

Also unavailing is Booker's complaint—raised for the first time on appeal—that the district court erred in instructing the jury that "[t]he lawyers have agreed that [Booker was previously convicted of a felony], so there is nothing for you to find . . . [and] nothing to argue about." JA 251. He contends that this instruction removed the government's burden of proving every element of the offense. Read in context, however, the jury instructions did no such thing. The court instructed the jury that it "must be convinced [that] the government has proven each and every one of the following elements beyond a reasonable doubt" to convict Booker of being a felon-in-possession, that the "first element is that the defendant has been convicted in any court of a crime punishable by imprisonment for a term of one year," and that "[i]f you have a reasonable doubt about any of these elements, you must find the defendant not guilty of th[e] charge." JA 251–52. At most, the objected-to instruction merely informed the jury that Booker had already stipulated to this element of the crime. *See* JA 21 (stipulation proposed by Booker: "The parties have agreed that Mr. Booker has a prior felony conviction."); JA 98–99 (Court: "You've agreed you have a felony conviction and the government doesn't have to prove that, is that true?" Booker: "Yes."); *see also Old Chief v. United States*, 519 U.S. 172, 186 (1997) ("[Defendant's] proffered admission would, in fact, have been not merely relevant but seemingly conclusive evidence of the element."). Perhaps more importantly, Booker did not object to this instruction at trial (preventing the district court from curing any potential

confusion), and we have repeatedly declined to revive a defendant's forfeited objection in such circumstances. *See United States v. Jones*, 108 F.3d 668, 673 (6th Cir. 1997) (en banc); *United States v. Casey*, No. 99-1585, 2000 WL 1721055, at *5 (6th Cir. Nov. 6, 2000) (per curiam).

Booker makes essentially three complaints about his sentence, none of which warrants relief. He complains that the district court should not have enhanced his guidelines calculation for possessing a stolen weapon, *see* U.S.S.G. § 2K2.1(b)(4), because he never knew the gun was stolen. But because the guideline does not contain a mens rea requirement, as he acknowledges, *see* Br. at 38; *see also* U.S.S.G. § 2K2.1 cmt. n.19 ("The enhancement under subsection (b)(4) for a stolen firearm . . . applies whether or not the defendant knew or had reason to believe that the firearm was stolen . . . ."), and because he acknowledges that the gun was in fact a stolen weapon, the district court did not err in applying the enhancement.

He complains that the district court unreasonably applied 18 U.S.C. § 3553 in sentencing him to 88 months' imprisonment. To the extent he argues that the district court improperly declined to depart from the advisory sentencing range under the guidelines, even though it realized it had authority to do so, *see* U.S.S.G. § 5K2.0, we do not have jurisdiction to hear his claim, *see United States v. Smith*, 278 F.3d 605, 609 (6th Cir. 2002). To the extent he argues that the district court improperly denied him a variance, we note that the district court's choice of an 88-month sentence falls within the range deemed appropriate by the Sentencing Commission (giving the sentence a presumption of reasonableness), *see Rita v. United States*, 127 S. Ct. 2456, 2462 (2007), that Booker's sentence left substantial room for the sentencing of worse felon-in-possession offenders

(the statutory maximum is 120 months), *accord United States v. Poynter*, No. 05-6508, __ F.3d ___, 2007 WL 2127353, at *6 (6th Cir. July 26, 2007), and that, as the district court noted, a substantial sentence is the only way to fulfill the "unspoken demand to protect the public" from someone "who repeatedly commits the same crime" and has amassed "14 convictions in seven years," JA 310; *see* 18 U.S.C. § 3553(a)(2)(C). Despite Booker's present contention to the contrary, the district court thoroughly reviewed the factors of section 3553(a), considered Booker's arguments for a lower sentence and rejected them and rejected Booker's complaint that Webb received a significantly lower sentence in state court. Sentencing courts are entitled to substantial discretion under *Booker*, and we cannot say the district court abused that discretion here. *See Rita*, 127 S. Ct. at 2469 ("Where a matter is . . . conceptually simple . . . and the record makes clear that the sentencing judge considered the evidence and arguments, we do not believe the law requires the judge to write more extensively.").

Booker also complains that the application of the advisory guidelines to his conduct amounts to an *ex post facto* punishment because he committed his crime before the Court decided *United States v. Booker*, 543 U.S. 220 (2005). The defendant in *Booker* itself, however, committed his crime before that decision, and yet the Court instructed the lower courts to apply the advisory guidelines on remand. *See id.* at 268. If that were not enough, our own circuit has rejected this argument before, *see United States v. Shepherd*, 453 F.3d 702, 705–06 (6th Cir. 2006), as has every circuit that has confronted the question, *see id.* (citing cases).

III.

For these reasons, we affirm.