NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0301n.06

No. 24-5729

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jun 16, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| KENDRICK WATSON, | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |
| | ) | |

Before: SUTTON, Chief Judge; GIBBONS and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Defendant-Appellant Kendrick Watson appeals his convictions and sentence for possession with intent to distribute fentanyl and various firearms offenses. We AFFIRM.

## I. Background

### A. The Search

On October 19, 2022, United States Postal Service (USPS) Postal Inspector Robert Weeks was screening parcels in a USPS distribution center located in Memphis, Tennessee. One such parcel was sent from Karen Watson, 12001 Lennox Street, Houston, Texas, to Kendarius Dejuan Watson, 1756 Edgeburg Lane, Cordova, Tennessee (the Parcel). Because the Parcel had characteristics associated with drug trafficking—a handwritten label, tape along every seam to reduce detectible odors, and an origin address in a city known to be a narcotics source—Weeks removed the Parcel from the mail stream, then searched both the sender and recipient addresses in a law-enforcement database. According to Weeks, the recipient's name was not associated with

the destination address and the sender's address did not exist at all—two more characteristics commonly associated with drug trafficking.

The next day, after a narcotics-detection dog alerted to the presence of drugs during an external examination of the Parcel, Weeks obtained a search warrant for the Parcel (the Parcel Warrant). The Parcel contained approximately one kilogram of cocaine. Paragraph 5 of the affidavit Weeks submitted in support of the application for the Parcel Warrant (the Affidavit) reads:

> A database search revealed the listed recipient "Kendarius Dejuan Watson" is not associated with 1756 Edgeburg Lane Cordova, TN 38016. A database search revealed the listed recipient information is false, misleading or fictitious as "Kendrick Dejuan Watson" is a name associated with the listed address. A database search revealed the return address 12001 Lennox St. Houston, TX 77092 does not exist. Postal data records revealed 1756 Edgeburg Lane has received three (3) other parcels from the Houston, TX area with similar weights and postage since September 7, 2022. Your affiant requested the assistance of a narcotics detecting canine to review the subject parcel.

R. 16-1, PID 208.

Law enforcement then obtained a warrant (the Property Warrant) to search the Edgeburg Lane address (the Property). The Property Warrant was to "be executed following a successful controlled delivery of [the Parcel] to the" Property. R. 16-2, PID 231.

On October 21, 2022, officers conducted a controlled delivery to the Property using imitation cocaine. When an undercover officer rang the doorbell, a male voice from inside the house asked if he needed to sign for the Parcel and the officer said he did not. After the officer left, Watson[1] came outside and brought the Parcel inside the house. The officers waited ten minutes to be sure no one else would come pick up the Parcel, then executed the Property Warrant.

---

[1] This opinion refers to Kendrick Watson by his last name and refers to Kendarius Watson, Marquavius Watson, and Celitria Watson by their first names to avoid confusion.

After Special Weapons and Tactics Team (SWAT) officers cleared the premises, Weeks and the other waiting officers searched the house. They found the Parcel (unopened), five firearms, ammunition, approximately $52,000 in cash, fentanyl, methamphetamine, a handpress with fentanyl residue on it, digital scales, multiple cell phones, a book titled "I.C.E. Eye See Everything the True Life of Kendrick Watson All Facts No Fiction," and paperwork in Watson's name. R. 100, PID 1132–33; R. 103, PID 1560; R. 112, PID 1632.

## B. Pre-Trial

On September 19, 2023, a grand jury indicted Watson on 12 counts: one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (Count 1); one count of possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a)(1) (Count 2); five counts of possessing a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Counts 3–7); and five counts of possessing a firearm while a felon, in violation of 18 U.S.C. § 922(g)(1) (Counts 8–12).

Less than one week later, Watson filed four motions: his first motion to suppress, his first motion to dismiss the indictment based on due process violations, a motion to instruct the jury on an entrapment defense, and a motion to sever Count 1 (possession with intent to distribute cocaine) from the other charges. In the motion to suppress, Watson argued that "the agents destroyed or manipulated" various cameras at the Edgeburg Lane property; Kendarius was not "fictitious" because a real person with that name lives in Memphis; the Affidavit misleadingly provided insufficient detail about the other packages sent from Houston to the Property; Weeks had not shown that Watson was "associated" with the Property, in part because the government had not produced the database search associated with the Affidavit; and the triggering event for executing the Property Warrant never occurred because Watson did not open the Parcel or move it from near

the front door.  R. 11, PID 36, 41–47.  He also asserted that Weeks "does not have any credibility" and requested an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).  *Id.* at PID 45–46.  A few weeks later, Watson filed a motion seeking jury instructions on perjury and a second motion to dismiss based on due process violations.

Watson reiterated his argument about the database search results at a November 16, 2023, status hearing.  In response, the government provided a printout of a search of the same database performed after the hearing.  That database printout listed Watson as associated with the address 1756 Edgeburg Lane, Memphis, Tennessee.  At the conclusion of the status hearing, the district court scheduled a motion hearing for January 4, 2024.  Between the two hearings, Watson filed a third motion to dismiss the indictment and an additional exhibit to support his motions to dismiss.

The district court began the January 4, 2024, motion hearing by denying Watson's request for a *Franks* hearing.  It also denied the first motion to suppress because Weeks had not provided false information in the warrant applications, and because any potential problems created by the references to Kendarius and Watson in the Affidavit did not "take away from" the other information supporting probable cause, even if more detailed information would have strengthened the Affidavit.  R. 56, PID 381–86.  Finally, the district court found that, once Watson took the Parcel inside the house, there was a successful controlled delivery.  It then continued the hearing to January 8, 2024, to address the three pending motions to dismiss the indictment.

On January 8, the district court noted another reason to deny the first motion to suppress: once Watson brought the Parcel inside the Edgeburg Lane residence, the officers could reasonably rely on that action constituting a successful controlled delivery.  It then heard testimony from three witnesses:  Watson's nephew Marquavius Deshaun Watson, Watson's ex-girlfriend April Malone, and Watson's business partner Tommasine Tabb.

Marquavius testified that he and Watson's sister Celitria went to the Property on October 21, 2022. While he was there, Marquavius accessed the previous day's doorbell camera recordings via a wall monitor and recorded five video clips on his cell phone but was unable to access recordings from any of the other interior or exterior cameras. He further testified that the Wi-Fi router was disconnected, the cameras in the living room and kitchen were turned around to face the wall, and the motion-activated camera on the garage door was on the ground, but he could not say when any of those things had happened. He did, however, testify that the doorbell camera and the garage camera—both motion-activated—activated when Watson left the Property on October 20, but that only the doorbell camera activated when Watson returned.

Malone testified that, in January 2023, she contacted Vivint, a home-security company that monitored the cameras at the Property, and obtained invoices in Watson's name. Vivint told Malone that it could not provide recordings from the day of Watson's arrest because it only stored recordings for fourteen days. Malone did not know if the cameras were recording the day of the arrest.

Finally, Tabb testified that she went to the Property on October 21, 2022. The motion-activated cameras were not working when she arrived. She could not definitively say whether they were recording at any point that day—only that they had been working when she last visited the Property, a few days prior.

The video evidence also showed that officers put a piece of tape over the external doorbell camera after making the controlled delivery but before executing the Property Warrant.

At the end of the January 8 hearing, the court took the three motions to dismiss under advisement. While the district court was considering them, Watson filed a second motion to suppress, a motion seeking jury instructions on lost or destroyed evidence and entrapment, and

two motions in limine to exclude evidence of seized currency and any evidence not yet provided to him. The government also filed a motion in limine to introduce evidence of Watson's receiving other packages.

Watson's second motion to suppress made many of the same arguments as his first, but added that it was misleading for the Affidavit to say that Watson was associated with 1756 Edgeburg Lane, Cordova, Tennessee, because the database search printout showed that Watson was associated with 1756 Edgeburg Lane, Memphis, Tennessee. The government responded that the court could take judicial notice that 1756 Edgeburg Lane, Memphis, Tennessee, does not exist, and that the only 1756 Edgeburg Lane address in the greater Memphis area is in Cordova, Tennessee; that "the database associated '1756 Edgeburg Lane' with Cordova in various other entries in the database"; and that "Memphis and adjacent neighborhoods often appear interchangeably in address searches." R. 58, PID 556–57. It also argued that whether the address was in Memphis or Cordova did not affect the probable-cause determination.

The district court denied all three motions to dismiss and both motions to suppress but took the motions for jury instructions under advisement. It denied the first motion to dismiss because Watson had not shown that the government destroyed exculpatory evidence, that the officers executing the Property Warrant "had anything to do with removing the exterior camera from above the garage door or rotating the interior cameras," or that the officers acted in bad faith. R. 63, PID 615–17. It specifically noted that (1) taping over the doorbell camera did not show bad faith because officers likely did so to protect themselves while executing the Property Warrant, and (2) Watson never explained what exculpatory evidence the doorbell camera would have shown had officers not taped over it.

The district court then held that the additional arguments Watson raised in his second and third motions to dismiss did not persuade, either. First, Watson did not show that an audio feed of the controlled delivery existed, that the Property Warrant required the officers to produce or maintain any such audio feed, or that an audio feed was necessary to establish the controlled delivery. Second, any alleged gaps in the chain of custody would go to the weight of the evidence, not its admissibility, and therefore were not proper bases for a motion to dismiss. And third, the government's failure to produce a hard copy of the exact database search that Weeks ran associating Watson with the Property did not negate the other bases for finding probable cause.

Finally, the district court denied both motions to suppress and Watson's request for a *Franks* hearing because, as it had already held during the motion hearing, the issuing magistrate judge "had more than enough evidence from which to find probable cause to issue a search warrant" and there was "no basis for invalidating the search of the residence." R. 63, PID 621–25.

## C.  Trial and Sentencing

The trial began on February 20, 2024. Before jury selection, the district court addressed the outstanding motions. It denied two of Watson's three pending motions seeking jury instructions—the motion seeking an entrapment instruction because Watson was making an argument about intent and knowledge, not entrapment, and the motion seeking a perjury instruction because nobody had been charged with perjury. It also denied Watson's motion to sever Count 1 because all the counts were based on the same series of events, and took the third pending motion for a jury instruction about lost or destroyed evidence under advisement. Finally, it denied all three motions in limine—Watson's first motion because of the currency's relevance, Watson's second motion because he could object if the government tried to introduce untimely evidence,

and the government's motion because the proposed evidence was insufficiently probative—and held that the contents of the book found at the Property could come in on cross-examination if Watson testified. Watson did not testify and the book was not admitted into evidence or referred to at trial.

On February 26, 2024, the jury found Watson guilty of possession with intent to distribute fentanyl (Count 2), three of the five counts of possession of a firearm in furtherance of a drug-trafficking crime (Counts 4, 5, and 6), and three of the five felon-in-possession counts (Counts 9, 10, and 11), but not guilty on the remaining firearm-possession counts (Counts 3, 7, 8, and 12). The court declared a mistrial on Count 1. And the parties stipulated that Watson had multiple felony convictions for offenses that had occurred on different occasions.

In April 2024, Watson filed a fourth motion to dismiss the indictment. He (1) sought the names of all the officers present at his arrest, (2) argued that failure to disclose that information was a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and (3) accused the officers of animus against him due to his having previously sued the Memphis Police Department and the City of Memphis. The government responded that the officers' names were not exculpatory evidence for *Brady* purposes, the court had already decided the relevant issues in the government's favor, and Watson had other ways of getting the officers' names if he wanted them. After holding a hearing on Watson's fourth motion to dismiss, the court denied it.

The district court sentenced Watson roughly four months later. The court dismissed Count 1 on the government's motion, adopted the Presentence Report (PSR), and sentenced Watson to 240 months' imprisonment on Count 2; 120 months, concurrent to Count 2, on Counts 9–11; and 300 months' imprisonment, consecutive to all other counts, on Counts 4–6, for a total term of 540 months, to run consecutively to the sentences imposed in three state-court cases. It also sentenced

Watson to three years of supervised release on Counts 2, 4–6, and 9–11, all to run concurrently; and a $300 mandatory special assessment, due immediately.

## II. Discussion

Watson raises six issues on appeal, arguing that the district court erred in (1) denying his motions to suppress, (2) denying his motions to dismiss, (3) denying his motion to sever, (4) not providing a jury instruction on lost or destroyed evidence, (5) denying him due process at his sentencing hearing, and (6) "den[ying him] due process under a totality of the circumstances." Appellant's Br. at 4. We affirm on all six issues.

### A. Motions to Suppress

1. Standard of Review

When reviewing a district court's ruling on a motion to suppress, we review factual findings for clear error and legal conclusions de novo. *United States v. Moon*, 513 F.3d 527, 536 (6th Cir. 2008). In doing so, "we must afford due weight to the factual inferences and credibility determinations made by the district court," *id.*, and view the evidence in the light most likely to support the district court's decision, *United States v. Moorehead*, 912 F.3d 963, 966 (6th Cir. 2019). "A denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason" supported by the record. *Id.* (cleaned up). The movant bears the burden of proof on a motion to suppress. *United States v. Blakeney*, 942 F.2d 1001, 1015 (6th Cir. 1991).

We review the denial of a *Franks* hearing under the same standard. *United States v. Graham*, 275 F.3d 490, 505 (6th Cir. 2001). Clear-error review applies to the district court's findings about the truth or falsity of statements in an affidavit, as well as the district court's determination whether any falsehoods were reckless, while we review materiality de novo. *United*

*States v. Elkins*, 300 F.3d 638, 649 (6th Cir. 2002). Additionally, we interpret affidavits using common sense, without "imposing technical requirements of elaborate specificity." *Id.* (cleaned up). "Minor discrepancies in the affidavit may reflect mere inadvertence or negligence, rather than the reckless falsehood that is required for exclusion." *Id.*

2. Analysis

Watson makes two arguments on this issue. He first argues that the Affidavit contains two falsehoods that warranted a *Franks* hearing—that Kendarius was "fictitious," and that Watson was associated with the Property. Appellant's Br. at 18–24. As to the latter, he argues that the information in the government's database search printout is not accurate, and that the printout showed Watson associated with an Edgeburg Lane address in Memphis, not Cordova. Second, he argues that there was no successful controlled delivery, and therefore no triggering event permitted the officers to execute the Property Warrant.

To obtain a *Franks* hearing, Watson needed to make a substantial preliminary showing that: (1) Weeks made a false statement in the Affidavit, either deliberately or "with reckless disregard for the truth," and (2) the false statement was "necessary to the finding of probable cause." *Franks*, 438 U.S. at 155–156. Both alleged falsehoods fall short of the *Franks* standard.

First, Weeks never averred that Kendarius is a "fictitious" person—only that "the listed recipient information is false, misleading or fictitious." R. 16-1, PID 208. The text of the Affidavit thus belies Watson's argument that Weeks was claiming that no person named Kendarius Watson exists. Second, Weeks consistently averred that Watson was associated with a 1756 Edgeburg Lane address in the greater Memphis area based on the results of a law-enforcement database search. As such, even if the information on the vehicle registration that Watson produced differed from the information in the database Weeks used, Watson provides no basis for a court to

determine that Weeks intentionally or recklessly made false statements about the results of his database search.[2] The same is true of Watson's argument about whether the Edgeburg Lane address was in Memphis or Cordova. The database search apparently listed both results together, and, as the government argued below, there is only one 1756 Edgeburg Lane address in the greater Memphis area—something Watson never disputed.

Finally, even if either statement were intentionally false or made with reckless disregard for the truth, neither statement was necessary to the probable-cause determination. Weeks averred that the Parcel had a fake return address in a state known to be a narcotics source, USPS data showed several similar packages sent from the fake return address to the Property in the preceding weeks, and a trained drug-sniffing dog alerted on the package. Given that a trained drug-sniffing dog's alert alone is sufficient to establish probable cause, *United States v. Diaz*, 25 F.3d 392, 393–94 (6th Cir. 1994), the issuing magistrate had "a substantial basis for finding that the affidavit established probable cause to believe that [controlled substances] would be found at the place cited," *United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001) (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir.1991)), without considering any of the contested statements. Accordingly, the district court did not err in denying Watson's request for a *Franks* hearing and his motions to suppress. *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011).

Watson's controlled delivery argument fares no better. An anticipatory warrant must be tied to a triggering event—here, a successful controlled delivery—that is "explicit, clear, and narrowly drawn." *United States v. Miggins*, 302 F.3d 384, 395 (6th Cir. 2002) (quotation marks and citation omitted). It is undisputed that Watson took the Parcel inside—something he need not

---

[2] The database printout appears to list Watson and Malone as associated with the Edgeburg Lane address based on a vehicle registration. The vehicle registration Watson provides lists the same car as registered to him and Malone at 4456 Riche Road, Memphis, Tennessee.

have done, as he could have left it on the porch—and officers recovered it when searching the Property. Additionally, although the agents did not require a signature on delivery, the Property Warrant did not specify that a signature was required for a successful controlled delivery and Watson cites no authority for such a requirement. Reading the Property Warrant "not hyper[-]technically, but in a commonsense fashion.," *id.* at 395 (cleaned up), the officers were entitled to execute the Property Warrant based on Watson's bringing the Parcel inside.

## B. Motions to Dismiss

### 1. Standard of Review

The Sixth Amendment guarantees certain rights for criminal defendants, including a defendant's right to "compulsory process for obtaining witnesses in his favor," U.S. Const. amend. VI, and to present witnesses and evidence in his defense, *United States v. Hamilton*, 128 F.3d 996, 1000 (6th Cir. 1997).[3] We review evidentiary rulings allegedly violating a defendant's Sixth Amendment rights de novo. *Id.* at 999.

### 2. Analysis

Prevailing on a compulsory-process claim requires a defendant to "at least make some plausible showing of how" evidence not presented "would have been both material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). "Material" means

---

[3] Despite contending that the district court erred in denying his motions to dismiss in the heading of Section V of his brief, Watson makes only Sixth Amendment arguments in that section, rather than directly addressing the district court's denial of his motions to dismiss. And, although Watson's statement of issues refers to the motions to dismiss, his entire argument on that issue is a single sentence stating that the motions to dismiss "should have been granted when it became clear that Appellant was not provided with all material and relevant information necessary in order for him to receive a fair trial." Appellant's Br. at 17. Watson has therefore forfeited on appeal challenges to the district court's denial of his motions to dismiss based on anything other than the Sixth Amendment arguments. *Buetenmiller v. Macomb Cnty. Jail*, 53 F.4th 939, 946 (6th Cir. 2022) ("It is insufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones. And in instances where issues are adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, we consider them forfeited." (cleaned up)). Here, we need not consider the forfeited issue to avoid "a plain miscarriage of justice." *Cockrun v. Berrien Cnty.*, 101 F.4th 416, 420 (6th Cir. 2024).

that there must be "a reasonable likelihood that the [evidence] could have affected the judgment of the trier of fact." *Id.* at 874.

On appeal, Watson argues that his-compulsory process rights were violated when the district court did not allow him to call Weeks as a witness at the January 2024 evidentiary hearing and the government did not provide adequate information about four categories of evidence— (1) the names of the officers present at the execution of the Property Warrant, along with information about certain policies and procedures of the Memphis Police Department; (2) information relating to a prior conviction; (3) Weeks' database search; and (4) a statement Watson made during his arrest that he was not worried about being arrested because he had cameras at the Property. He also argues that the information he sought constitutes *Brady* material.

First, Watson could have obtained the information about the officers' names and police department policies from sources other than the prosecution, such as by requesting information about Memphis Police Department policies using the Department's own procedures for requesting records, asking witnesses at trial about the names of other officers who were present, subpoenaing federal agents using the regulations promulgated based on *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1950), and/or requesting records through the Tennessee Public Records Act, Tenn. Code § 10-7-503 (2023). He did none of those things. *Spirko v. Mitchell*, 368 F.3d 603, 611 (6th Cir. 2004) ("[B]ecause the evidence was available to [the defendant] from other sources than the state, and he was aware of the essential facts necessary for him to obtain that evidence, the *Brady* rule does not apply.").

Second, Watson's only explanation for why the information was material is that the officers "would have been the parties responsible for interfering with the surveillance equipment" that he alleges was sabotaged at the Property. Appellant's Br. at 50. But the district court held that

Watson had not shown that the officers destroyed evidence, sabotaged the garage camera or interior cameras at the Property, or otherwise acted in bad faith—a ruling supported by the record, and one that Watson does not meaningfully challenge on appeal. Not only was no witness able to testify regarding when the cameras stopped working, Marquavius testified that the motion-activated garage camera did not activate when Watson returned to the Property on October 20, suggesting it was already broken before officers executed the Property Warrant. Mere speculation that officers may have disabled cameras does not constitute a "plausible showing" that the information Watson requested about the officers would have been "material and favorable to his defense." *Valenzuela-Bernal*, 458 U.S. at 867. And showing neither that the evidence is material nor that it would tend to be exculpatory also forecloses a *Brady* argument. *Brady*, 373 U.S. at 87–88; *Strickler v. Greene*, 527 U.S. 263, 280 (1999).

The record belies Watson's second argument about his criminal-history information because the government did provide that information. Watson also could have obtained information about his criminal history by contacting the clerk's office, or by downloading documents from prior case dockets on PACER, which forecloses a *Brady* argument. *Spirko*, 368 F.3d at 611. And the notice of penalties informed Watson that if he had a prior conviction under 18 U.S.C. § 924(c), any other § 924(c) conviction would be subject to a mandatory minimum of twenty-five years' imprisonment.

The database argument, which overlaps with Watson's arguments in support of his motions to suppress, fares no better for three reasons. First, prosecutors do not have an "undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance." *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). Watson therefore needed to show that the failure to preserve Weeks' initial database search was done in bad faith; and he offers no

-14-

basis for so finding. *United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001). Second, as discussed above, *supra* Part II.A.2, the Affidavit gave the issuing magistrate judge adequate basis for finding probable cause even without the database search. Third, even though he did not receive a copy of the original database search, Watson received a copy of a replica search that Weeks ran later, which nobody prevented him from using as part of his defense.

Watson's fourth argument, about a statement he made during his arrest, also falls short because he knew about his own statement and was not prevented from presenting it at trial. In fact, the trial transcript reveals that he cross-examined Weeks about it.

Finally, Watson's argument that his inability to call Weeks as a witness during evidentiary hearings violated his Sixth Amendment rights is also unpersuasive. As discussed above, *supra* Part II.A.2, Weeks did not testify at the pre-trial hearings because Watson never showed that he was entitled to a *Franks* hearing. Watson conceded at the hearing on the motions to dismiss that he did not need to call a government witness for those motions. And Weeks testified at Watson's trial and Watson cross-examined him. Watson therefore has not shown that Weeks' not testifying at the pre-trial evidentiary hearings prevented him from presenting his defense.

### C. Motion to Sever

1.    Standard of Review

Even when multiple counts in an indictment are properly joined under Federal Rule of Criminal Procedure 8(a), a district court may order separate trials if the joinder of offenses "appears to prejudice a defendant." Fed. R. Crim. P. 14(a). We generally review the denial of a Rule 14 motion alleging prejudicial joinder for abuse of discretion. *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005). However, where a defendant does not renew his Rule 14 motion at the close of evidence, he forfeits the argument and we review only for plain error. *United States v. Chavis*,

296 F.3d 450, 457 (6th Cir. 2002). Plain error is a legal error that is obvious and affects substantial rights. *United States v. Olano*, 507 U.S. 725, 732-34, (1993). A defendant has the burden of showing prejudice—in other words, that the error "affected the outcome of the district court proceedings." *Id.* at 734.

2.    Analysis

Watson contends that the district court erred by denying his motion to sever Count 1 from the other counts because (1) "[t]he facts and circumstances surrounding that Count [are] separate and distinct from the other charges"; (2) he had distinct defenses for the different counts, including an entrapment defense that applied only to Count 1; and (3) he "was not able to fully put on his defense to the extent that he wanted to, out of fear of confusing the jurors." Appellant's Br. at 30–33. Because he did not renew his Rule 14 motion at the close of evidence, we review for plain error.

The district court did not plainly err. As to the first argument, Count 1 charged Watson with attempted possession of cocaine—an offense of similar character to Count 2 (fentanyl possession) and connected to Counts 2–7 (fentanyl possession and possession of firearms in furtherance of a drug-trafficking crime) through Watson's overarching drug-distribution scheme. We therefore disagree with his assertion that the facts and circumstances of the different offenses are entirely "separate and distinct" because only Count 1 dealt with the contents of the Parcel. Appellant's Br. at 31.

Watson's second argument is unpersuasive because his only explanation for why he could not raise an entrapment defense without severing Count 1 is his assertion, without elaboration, that "highly technical" theories would be "overly confusing for an average jury." *Id.* at 32. But we presume that juries can consider charges separately and apply evidence to each charged offense as

appropriate. *See United States v. Cope*, 312 F.3d 757, 781 (6th Cir. 2002). Moreover, as the government points out, the jury acquitted Watson of some charges and convicted him of others, suggesting that it considered the different charges separately.

Watson's last argument misses the mark because he never explains what defenses he was unable to raise at trial but would have raised had the district court severed Count 1. Moreover, the trial ended with a mistrial on Count 1 and the district court granted the government's motion to dismiss that charge at Watson's sentencing hearing. He therefore has not shown prejudice because it is unclear how severing Count 1 would have led to a different outcome on the remaining charges. *Olano*, 507 U.S. at 734.

### D. Jury Instructions

1.    Standard of Review

We generally review a challenge to jury instructions for abuse of discretion, which requires us to consider the instructions "as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision." *United States v. Eaton*, 784 F.3d 298, 306–07 (6th Cir. 2015) (quotation marks and citation omitted). "A district court's refusal to deliver a requested instruction is reversible only if that [requested] instruction is (1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991). "Harmless errors are disregarded." *United States v. Blood*, 435 F.3d 612, 623 (6th Cir. 2006).

2.      Analysis

Watson appeals the district court's refusal to give a jury instruction about lost or destroyed evidence, based on the government's allegedly destroying cameras at the Property and failing to preserve video footage, as well as the officers' not wearing body cameras while executing the Property Warrant.  The instruction he sought reads:  "If you find that the government intentionally failed to preserve video camera footage that the government knew or should have known would be evidence in this case, you may infer, but are not required to infer, that this evidence was unfavorable to the government."  R. 53, PID 359.

That instruction was "based on speculation" and lacked "support in the evidence and the law."  *Blood*, 435 F.3d at 623 (quotation marks and citation omitted).  As to the cameras at the Property, again, the district court held an evidentiary hearing and found that Watson had not shown that evidence was destroyed, or that the government acted in bad faith.  Watson presented no additional evidence to support this theory at trial that would have required the district court to reconsider its finding and give the requested jury instruction.  Moreover, he was still able to raise this theory at trial, including cross-examining witnesses about it and incorporating it into his opening and closing arguments.  Accordingly, even assuming the instruction about lost or destroyed evidence satisfied the first two requirements for reversal, Watson has not shown that the district court's failure to give it substantially impaired his defense.  *Williams*, 952 F.2d at 1512.

The same goes for Watson's argument about the officers not wearing body cameras.  Watson's attorney questioned Weeks about the lack of body cameras at trial.  Weeks responded, "We do not have body cameras.  We are not issued body cameras.  Our agency has not been issued them yet.  We are not required to wear those.  DEA is not required to wear those."  R. 100, PID 1222.  Counsel also incorporated the issue into opening and closing arguments, arguing that the

lack of body cameras undercut the officers' credibility and should be read as an attempt to avoid creating video footage that would be unfavorable to the government. Watson therefore has not shown that the district court's failure to give the requested jury instruction substantially impaired that aspect of his defense, either. *Williams*, 952 F.2d at 1512.

Finally, the record shows that the only available video footage was in Watson's control, accessible via his Vivint account. An instruction that the government failed to preserve video footage would thus have been misleading and potentially confusing to the jury.

### E. Sentencing

1.       Standard of Review

We generally review challenges to a sentence's procedural and substantive reasonableness for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). Procedural unreasonableness means that the district court committed "significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C. ]§ 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.* The substantive reasonableness inquiry asks whether the sentence is proportionate to the seriousness of the circumstances of the offense and offender. *United States v. Schrank*, 975 F.3d 534, 536 (6th Cir. 2020).

2.       Analysis

Watson has not specified whether his challenge is procedural or substantive, but he makes arguments that fall into both categories. He argues that his due process rights were violated at his sentencing hearing because (1) he should have received the names of the officers who executed the Property Warrant, (2) he never received information about his prior federal bank-robbery

conviction, and (3) the court did not give sufficient weight to his history of allegedly being treated unfairly by the criminal-justice system. He also argues that his sentence was substantively unreasonable because he deserved a below-Guidelines sentence, and because his ultimately receiving a sentence below the mandatory minimum for his prior § 924(c) conviction (following two sentence reductions) means it is unclear whether he had a prior § 924(c) conviction.

Watson's first two arguments relating to the officers' names and his prior conviction are unpersuasive because, in addition to the reasons already discussed above, *supra* Part II.B.2, he never explains how the officers' names would be relevant for sentencing purposes. All he offers is a conclusory assertion that not receiving that information from the government "prevented him from having a meaningful analysis on the 3553 factors." Appellant's Br. at 41.

Watson's other point, regarding his alleged history of unfair treatment, consists of nothing more than a bare assertion that "Appellant had an extensive history of being treated unfairly by the justice system." *Id.* at 42. He failed to explain, either in his brief or at the sentencing hearing, precisely what that history is or why it would be relevant under the 3553(a) factors.

Watson's arguments about substantive unreasonableness do not help him, either. As a starting point, federal "courts of appeals may—but are not required to—presume that a within-Guidelines sentence is reasonable." *Peugh v. United States*, 569 U.S. 530, 543 (2013). Because the district court sentenced Watson to a within-Guidelines range and discussed the § 3553(a) factors, we apply that presumption here.

"[A]ssertion[s] that the district court should have balanced the § 3553(a) factors differently" do not merit reversal because the question is not "whether in the first instance we would have imposed the same sentence." *United States v. Sexton*, 512 F.3d 326, 332 (6th Cir.2008) (quotation marks and citation omitted). Watson's assertion that his personal characteristics and

conduct "warrant a sentence below the Guidelines," Appellant's Br. at 43, standing alone, thus does not entitle him to a lower sentence.

Watson's final argument focuses on his sentence for his prior § 924(c) conviction. In essence, he appears to argue that after his sentence reductions, his sentence was inconsistent with the mandatory minimum sentence for the offense and it is thus doubtful that he was convicted of a § 924(c) offense. However, there are several possible explanations for his sentence reductions on his prior § 924(c) conviction, including agreements under seal or the provision of substantial assistance. But nothing suggests that the government was withholding information about the bases for those sentence reductions. Rather, the record is simply unclear on that point. Accordingly, as the district court noted, Watson himself seems to be in the best position to explain those two sentence reductions. And, in any case, Watson's speculation about the possible bases for his sentence reductions is not enough, on its own, to undermine the legitimacy of using his prior conviction under § 924(c)—for using a firearm during a Hobbs Act robbery—as a basis for a sentencing enhancement here. In short, he has not shown any violation of his due process rights at sentencing.

## F. Cumulative Error

That leaves Watson's argument that the cumulative errors in this case were so prejudicial as to violate his due process rights. To prevail on this cumulative-error argument, Watson "must show that the combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). But, as discussed above, the Parcel and Property Warrants were supported by probable cause, Watson's bringing the Parcel inside constituted a successful controlled delivery, and Watson did not adequately support his allegations that officers tampered with the cameras at the Property, or that,

even if they did, such tampering undermines the case against him.  And Watson argues only that those already addressed arguments constitute cumulative error when considered as a group. Accordingly, we also reject Watson's final argument.

*     *     *

For the reasons set out above, we AFFIRM.